636 So.2d 494 (1994)
Jerome ALLEN, Appellant,
v.
STATE of Florida, Appellee.
No. 79003.
Supreme Court of Florida.
March 24, 1994.
Rehearings Denied May 23, 1994.
James B. Gibson, Public Defender and Christopher S. Quarles, Asst. Public Defender, Daytona Beach, and Professor Victor L. *495 Streib, Cleveland State University, Cleveland, OH, for appellant.
Robert A. Butterworth, Atty. Gen. and Kellie A. Nielan, Asst. Atty. Gen., Daytona Beach, for appellee.
Howard Babb, Public Defender and Billy H. Nolas, Asst. Public Defender, and Julie D. Naylor, Ocala, amicus curiae for the Fifth Judicial Circuit Public Defender.
Mark Evan Olive, Tallahassee, amicus curiae for Children First Partners.
PER CURIAM.
Jerome Allen appeals from a judgment imposing a sentence of death upon him. We have jurisdiction.[1]
On December 10, 1990, Stephen DuMont was robbed and wounded by a shotgun while working at a gas station in Titusville. He did not immediately lose consciousness and, before his death, was able to describe his assailants and the car they were driving. The automobile's description was similar to that of a car later reported stolen. The woman who owned the stolen car also reported that a light bulb on her porch had been unscrewed, and deputies were able to recover a fingerprint there.
Deputies found the stolen automobile early the next morning, stuck in the soft sand of an orange grove. A white male later identified as Brian Patrick Kennedy was lying in the front seat of the car. The steering column was damaged in a way that suggested hotwiring. Two sets of footprints trailed off from the car into the orange grove. A canine unit tracked one set of footprints to a house where Eugene Roberson lived. The print from one of Roberson's fingers matched the one found at the porch where the light bulb had been unscrewed.
Further examination of the interior of the stolen vehicle revealed a palm print matching that of Jerome Allen, the defendant in the proceedings below. At the time of the murder, Allen was fifteen years of age.
On December 11, 1990, deputies questioned Allen after reading him his rights. At one point Allen asked what would happen to someone present at a robbery who did not actually pull the trigger.
Later, deputies placed Allen in a holding cell near Eugene Roberson. A video camera and hidden microphone recorded everything the two did and said. At this point, Roberson began telling Allen about his own interrogation. Roberson said he had told the deputies everything, including that he had pulled the trigger. Roberson said he told deputies that Allen had stolen the car. During the course of this conversation, both Allen and Roberson incriminated themselves and admitted their involvement in the murder.
Deputies later searched Allen's home. There they found shotgun shells, ammunition, and a sawed-off shotgun. However, experts could not say with certainty whether DuMont had been killed with that particular gun.
On March 18, 1991, Allen asked the trial court to rule that death was not a possible penalty because of Allen's age at the time of the murder. Allen also asked that he be given separate juries for the two phases of his trial, one to determine guilt, and the other to determine the penalty. All requests were denied.
Allen further moved to suppress statements he made to police. These were partially granted, though the judge declined to suppress the statements Allen had made to Roberson in the holding cell. The trial court also would not suppress the shotgun and shells seized at Allen's residence.
The case went to jury trial on July 8, 1991. The jury found Allen guilty of first-degree murder, armed robbery, possession of a short-barreled shotgun, and grand theft of an automobile.
The penalty phase began August 9, 1991. There, the State's chief witness was Brian Patrick Kennedy. Kennedy had turned state's evidence as part of a deal that, among other things, would mean he could not receive the death penalty for his part in the DuMont murder.
*496 Kennedy described how he and his two companions stole and hot-wired the car, then proceeded to the gas station where DuMont later was found. According to Kennedy, Roberson was the one who held the gun during the robbery, but Allen was the one who had urged Roberson to kill DuMont to prevent further identification of them. Kennedy said that Allen yelled for Roberson to kill the man, and Roberson eventually complied.
The penalty-phase jury returned a recommendation of death on a seven-to-five vote.
At the sentencing hearing on October 24 and 25, 1991, the trial court permitted Allen to be represented by private counsel after Allen alleged that the public defender had a conflict of interest in the case. The judge also heard additional evidence not available to the penalty-phase jury. Jerome Allen's older sister, Sue Ann Allen, testified that her brother had attempted to stop her from abusing drugs. A forensic psychologist, Dr. Bruce Frumpkin, testified that Allen had had a traumatic, chaotic childhood. His father violently attacked him on occasion, and Allen fought back. Allen suffered from behavioral and learning disorders. He had been very close to his grandfather and a minister named Reverend Jones, both of whom had died. Jerome Allen later told his mother that Reverend Jones, now deceased, came to visit him in jail.
Dr. Frumpkin also noted that Allen had suffered head trauma that may have resulted in organic brain injury or neurological problems. Others in Allen's family had histories of psychiatric disorders. Allen's verbal IQ score was 76, placing him in the lower fifth percentile; and his full IQ was 77, placing him in the borderline range  the lower seventh percentile.
Allen's mother indicated that her son sometimes went into a "daze" and would remember nothing said to him during these periods. She said Allen suffered fainting spells about once a month, in which he would lose consciousness for about five minutes at a time.
After hearing this evidence and additional argument, the trial court sentenced Allen to death. The judge also imposed a departure sentence of life imprisonment for robbery, ten years with a five-year minimum mandatory for possession of a short-barreled shotgun, and five years for grand theft.
We begin by examining the alleged guilt-phase issues raised by Allen. First, Allen argues that error occurred because he was indicted by a grand jury from which juveniles had been excluded by operation of Florida law. We find this argument without merit. The state obviously is entitled to enact a reasonable age restriction on jury service. Persons under the age of eighteen are subject to a variety of restrictions that render them unsuitable for jury service, including the obligation to attend school and restrictions on the ability to drive a car.
Second, Allen argues that statements police obtained from Allen were inadmissible. We agree with Allen that all police questioning should have stopped as soon as his mother asked to see her son.[2] However, the statements Allen actually made during the period of time in question, in light of the entire record, could not possibly have affected the outcome of the proceedings below. The error thus was harmless beyond a reasonable doubt. State v. DiGuilio, 491 So.2d 1129 (Fla. 1986). We find no other error on this point.
On a related point, Allen argues that it was error to admit evidence obtained from electronic eavesdropping of statements he and Roberson made in their prison cells. We disagree. Voluntary jailhouse conversations between inmates are not entitled to the same degree of privacy afforded some other communications. Lanza v. New York, 370 U.S. 139, 82 S.Ct. 1218, 8 L.Ed.2d 384 (1962). Thus, as a general rule, the courts have permitted the use of such evidence where it *497 was electronically recorded, at least in the absence of any factor diminishing the trustworthiness of the conversation such as coercion or trick. E.g., Williams v. Nelson, 457 F.2d 376 (9th Cir.1972).
There thus was no error here. We caution, however, that our conclusion in this regard rests on the fact that there was no improper police involvement in inducing the conversation nor any intrusion into a privileged or otherwise confidential or private communication. A different result might obtain otherwise. For example, police impropriety would exist if police deliberately fostered an expectation of privacy in the inmates' conversation, as happened in State v. Calhoun, 479 So.2d 241 (Fla. 4th DCA 1985), especially where the obvious purpose was to circumvent a defendant's assertion of the right to remain silent. Id. The present case does not cross the line of what is permissible.
We also are unpersuaded by the remaining issues raised by Allen.[3] These arguments either are meritless or at best dealt with trivial mistakes that singly or collectively amounted to harmless error. DiGuilio.
We find one issue dispositive as to the penalty phase. Allen's counsel has noted  and the State does not dispute  that more than half a century has elapsed since Florida last executed one who was less than sixteen years of age at the time of committing an offense. In the intervening years, only two death penalties have been imposed on such persons, and both of these later were overturned.[4]
There may be a variety of reasons for this scarcity of death penalties imposed on persons less than sixteen years of age. There may be public sentiment against death penalties in these cases, or prosecutors may simply be convinced that juries would not recommend death or the judge would not impose it. We need not conduct a straw poll on this question, in any event. Whatever the reasons, the relevant fact we must confront is that death almost never is imposed on defendants of Allen's age.
In sum, the death penalty is either cruel or unusual if imposed upon one who was under the age of sixteen when committing the crime; and death thus is prohibited by article I, section 17 of the Florida Constitution.[5]Tillman v. State, 591 So.2d 167, 169 n. 2 (Fla. 1991). We cannot countenance a rule that would result in some young juveniles being executed while the vast majority of others are not, even where the crimes are similar.[6] Art. I, § 17, Fla. Const.
*498 The remaining penalty-phase issues are moot and will not be addressed here.[7] For the foregoing reasons, we affirm the convictions and sentences imposed upon Allen, with the exception that the death penalty is vacated and reduced to life imprisonment without possibility of parole for twenty-five years.
It is so ordered.
McDONALD, SHAW, KOGAN and HARDING, JJ., concur.
OVERTON, J., concurs specially with an opinion.
GRIMES, J., concurs with an opinion.
BARKETT, C.J., concurs in result only.
OVERTON, Justice, specially concurring.
I concur in the vacation of Allen's death sentence and the imposition of a life sentence for two reasons. First, I find that the United States Supreme Court's decision in Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), mandates this result. Second, I find that, under the Florida Constitution, it is also unconstitutional to execute an individual who was under sixteen years of age at the time the individual committed the offense. In my view, the age of "under sixteen" is the proper constitutional dividing line. I do note that other states, by legislative action, have set a higher age as the dividing line for when someone can be executed. See, e.g., Cal.Penal Code § 190.5 (West 1993) (the death penalty shall not be imposed upon any person who is under the age of eighteen at the time of the commission of the crime).
GRIMES, Justice, concurring.
I am unwilling to categorically say that the Florida Constitution prohibits the imposition of the death penalty upon a person below the age of sixteen under any circumstances. However, I am convinced that Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), precludes the execution of anyone under sixteen pursuant to Florida's death penalty statute, as presently worded.
NOTES
[1] Art. V, § 3(b)(1), Fla. Const.
[2] § 39.037(2),Fla. Stat.(Supp. 1990); see J.E.S. v. State, 366 So.2d 538 (Fla. 1st DCA 1979) Dowst v. State, 336 So.2d 375 (Fla. 1st DCA), cert. denied, 339 So.2d 1172 (Fla. 1976). These last two cases were decided under superseded law, but the statutory language is sufficiently similar that the same conclusion still obtains, although failure to notify parents upon arrest will not in and of itself automatically invalidate the confession. Doerr v. State, 383 So.2d 905 (Fla. 1980).
[3] These are: (a) that two jurors were improperly excused for cause; (b) that irrelevant evidence was improperly admitted, including packages of cigarettes, money, a shotgun, and ammunition; (c) that Detective Carter gave improper character testimony when he stated that he had "dealt with [Allen] before"; (d) that certain guilt-phase jury instructions should not have been given, while others were improperly denied, including instructions on possession of recently stolen property, circumstantial evidence, independent act, and third-degree murder; (e) that the State improperly withheld evidence from the defense, and the trial court erred in not granting a continuance for the defense to investigate that evidence; (f) that the trial court erred in failing to disqualify the public defender's office for a conflict of interest; (g) that the introduction of Roberson's confession violated Allen's right to confront a witness, (h) that Detective Carter improperly commented on Allen's silence; and (i) that the State made improper argument on lack of remorse, the law governing mitigating evidence, victim impact, and the fact that Allen could be set free some day if not executed.
[4] Ross v. State, 386 So.2d 1191 (Fla. 1980); Vasil v. State, 374 So.2d 465 (Fla. 1979), cert. denied, 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826 (1980).
[5] Unlike the federal Constitution, the Florida Constitution prohibits "cruel or unusual punishment." Art. I, § 17, Fla. Const. This means that alternatives were intended. Tillman v. State, 591 So.2d 167, 169 n. 2 (Fla. 1991).
[6] We do not find persuasive the State's argument that execution of young juveniles is no different than the execution of women, in that both seldom happen. Nothing in the Constitution prohibits any court from taking notice of the peculiar condition and historical treatment of the very young. The law itself for centuries has recognized that children are not as responsible for their acts as are adults  a conclusion also supported by the scarcity of death penalties imposed on the very young in this country. On the other hand, adult women and men committing similar crimes must be treated the same under the rule of equal protection. This conclusion is not undermined by the fact that women seldom commit murder and, when they do, usually do so in extenuating circumstances prompted by violent treatment by men. See Report of the Florida Supreme Court Gender Bias Study Commission, 42 Fla.L.Rev. 803, 838 (1990). As a result, many murder cases against women result in a conviction less than first-degree murder or are so mitigated that death is not imposed even if the jury returns a verdict of first-degree murder. The fact remains that men and women are treated essentially the same for murders that are equally aggravated and mitigated. Compare Buenoano v. State, 527 So.2d 194 (Fla. 1988) with Ferguson v. State, 417 So.2d 631 (Fla. 1982).
[7] We also note the decision in Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988). While Thompson was a plurality opinion, it is clear that a majority of the Court there found the execution of young juveniles a highly questionable practice under the United States Constitution. Other states have construed Thompson as prohibiting the death penalty in cases similar to Allen's. Flowers v. State, 586 So.2d 978 (Ala. Crim. App.), cert. denied, 596 So.2d 954 (Ala. 1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1995, 118 L.Ed.2d 591 (1992); State v. Stone, 535 So.2d 362 (La. 1988). The exact precedent set in Thompson's plurality opinion and concurrence may not be conclusively clear, but we believe the decision there supports the result we reach today.