807 So.2d 713 (2002)
Joshua PHILLIPS, Appellant,
v.
STATE of Florida, Appellee.
No. 2D99-3734.
District Court of Appeal of Florida, Second District.
February 6, 2002.
*714 James Marion Moorman, Public Defender, and Deborah K. Brueckheimer, Assistant Public Defender, Bartow, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Katherine V. Blanco, Assistant Attorney General, Tampa, for Appellee.
CASANUEVA, Judge.
Tried as an adult for the murder of eight-year-old Madelyn Rae Clifton, Joshua Phillips, fourteen years old at the time of the homicide, appeals from both his conviction for first-degree murder and his sentence of life imprisonment without the possibility of parole. We find that no harmful error occurred at trial and affirm his conviction. As for his sentence, Mr. Phillips' primary contention is that his chronological age renders his punishment cruel and unusual. For the reasons set forth in this opinion, we hold that his punishment is constitutional and, accordingly, decline to set aside his sentence and impose, as he requested, a new sentence of life imprisonment with the possibility of parole. We conclude that only the legislature can create a sentence of life imprisonment with the possibility of parole for a juvenile convicted as an adult of first-degree murder.
There are strong arguments in favor of the penalty Mr. Phillips proposes as well as strong arguments in opposition. It is conceivable that Florida's state attorneys and trial judges alike would prefer a third sentencing alternative. However, public policy concerns about a juvenile's degree of culpability, potential for rehabilitation, and appropriate punishment are best resolved by the people's representatives the legislature. This court's task is only to measure the penalty imposed against constitutional standards.

FACTS
Maddie Clifton, eight years of age, came home from school at 4:30 p.m. on November 3, 1998, practiced her piano, and then went outside to play. She first went to the yard of a sixteen-year-old neighbor and then returned to her own yard. The neighbor's grandmother could see Maddie in her driveway and she also saw Joshua Phillips "creeping up" on Maddie. She watched them for a few moments but went back into her home after deciding that what she saw was nothing more than two kids playing together. By 6:20 p.m. Maddie's mother called her children to dinner, and when Maddie did not appear, Mrs. Clifton asked some of the neighbors to look for her daughter, but no one could find her. By 6:33 p.m. Mrs. Clifton called 911.
That evening several of the neighborhood children, including Joshua, took part in a search. Witnesses to that event described Joshua as "acting normal" but looking as if he had just taken a shower. The next day a Jacksonville Sheriff's Office detective spoke with Joshua about Maddie, who stated that he had seen Maddie the day before but had not played with her. He was not supposed to play with her because of their age difference. Police searched the Phillips' storage shed and car after Joshua's father arrived home, but they found nothing. A couple of days later, another homicide detective went to the Phillips' home when only Joshua was present and interviewed Joshua as he sat on the bed in his room.
Maddie's body was not discovered until November 10, 1998, when Joshua's mother, upset and crying, flagged down uniformed officers who were doing investigations in the neighborhood. The officers and Mrs. Phillips went to Joshua's room and opened *715 the door. There they saw two small feet with white socks sticking out from the bottom of Joshua's waterbed, along with liquid coming from underneath the bed and tape on the floor. A strong odor emanated from the room, which was immediately sealed as a crime scene. One of the detectives then picked up Joshua at school and took him to the police station.
When Joshua's room was searched the police found several types of air fresheners, rolls of tape, a baseball bat hidden behind a dresser, and a Leatherman knife tool. Maddie's body was under the waterbed with her shirt pulled up and her panties beneath her.
Joshua confessed to killing Maddie. He claimed that the two were playing with a baseball in his back yard when he hit the ball very hard and accidentally struck her near the left eye. She began to cry and holler, so Joshua, fearful that his father would be angry at him for playing with the younger girl, took her into his room. She was bleeding from the gash and crying loudly, and to keep his father from discovering her he struck Maddie once or twice in the head. She whimpered, and when she began to moan more loudly he took his knife and cut her throat. Then he concealed her body by prying off the side of his waterbed and pushing Maddie underneath. Joshua's father had come home by this time, and, realizing that Maddie's labored breathing was loud enough for his father to hear in another room, Joshua pulled the child out and stabbed her in her lungs so that she would stop breathing. He explained that her shorts and underwear came off when he dragged her into his room and that her shoes came off when he shoved her under the bed the second time. All of this happened because Joshua was afraid of getting in trouble.
The State's medical expert testified that Maddie had suffered three separate attacks. She was struck three times on her forehead and top of her head, receiving wounds that would have been fatal about thirty minutes after infliction. Her neck wounds perforated her windpipe, causing her to bleed to death or drown in her own blood. Nine stab wounds to her chest and abdomen were inflicted when she was already dead. However, Maddie's hand clutched a bracket from the waterbed frame, which indicated that she was still alive when Joshua shoved her underneath.

PENALTY ISSUES
Exceeded only by the death penalty, a sentence of life imprisonment without parole is the second most severe penalty authorized by Florida law. Presently, for first-degree murder, only these two penalties are authorized by statute. We must now determine whether, in these circumstances, life imprisonment without parole violates the constitutional guarantee prohibiting cruel and unusual punishment.

EIGHTH AMENDMENT
Part of the Bill of Rights of the United States Constitution, the Eighth Amendment states that "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."[1] The Eighth Amendment's guarantee against cruel and unusual punishment has been interpreted as providing two guarantees, the first and foremost of which is a bar against unnecessarily painful or barbarous methods of punishment. An unconstitutional penalty, in this regard, is *716 one that is soundly rejected by the evolving standards of decency that mark the progress of a maturing society. Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). The amendment also forbids penalties that are grossly disproportionate to the crime being punished. For example, a valid punishment, albeit severe, may be unconstitutional when it is paired with a sufficiently minor crime. Harmelin v. Michigan, 501 U.S. 957, 996-98, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring). However, proportionality challenges in noncapital[2] cases should rarely be successful. Rummel v. Estelle, 445 U.S. 263, 272, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980).
Here, Mr. Phillips contends that sentencing him to life imprisonment without the possibility of parole for a first-degree murder he committed when he was fourteen years old is cruel and unusual punishment and bases his challenge upon the second protection afforded by the Eighth Amendmentthe prohibition against disproportionate punishment. He does not contend, however, that his sentence would be disproportionate had it been imposed on an adult. To evaluate Mr. Phillips' contention, we must examine the contours of Eighth Amendment protections as set forth by the Supreme Court of the United States and the federal courts of appeal.
We begin with the Supreme Court's pronouncements in Harmelin v. Michigan, 501 U.S. at 957, 111 S.Ct. 2680. In responding to Harmelin's contention that Michigan was required by the Eighth Amendment to create a sentencing scheme whereby life imprisonment without the possibility of parole would be but the most severe of a number of discretionary penalties available to a sentencer, a majority of the Court rejected the claim as having no basis in the Eighth Amendment's text. "Severe, mandatory penalties may be cruel, but they are not unusual in the constitutional sense, having been employed in various forms throughout our Nation's history." Id. at 994-95, 111 S.Ct. 2680. Furthermore, the Court noted that "there can be no serious contention, then, that a sentence which is not otherwise cruel and unusual becomes so simply because it is mandatory." Id. at 995, 111 S.Ct. 2680. Accordingly, we conclude that a per se constitutional violation does not occur merely because Mr. Phillips' sentence is both mandatory and severe.
Next, we examine whether the narrow proportionality principle provided for by the Eighth Amendment applies to this noncapital crime. Justice Kennedy explained for the Court in Harmelin, 501 U.S. at 997, 111 S.Ct. 2680, that the "Eighth Amendment proportionality principle also applies to noncapital cases." Justice Kennedy's opinion noted that in Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), the Supreme *717 Court held "that a sentence of life imprisonment without possibility of parole violated the Eighth Amendment because it was grossly disproportionate to the crime of recidivism based on seven underlying nonviolent felonies." Harmelin, 501 U.S. at 997-98, 111 S.Ct. 2680. Although this case may be distinguished from Solem because it involves a crime of violence and does not involve a recidivist offender, the Solem analysis and its principles nonetheless apply.[3]
Applying Solem and Rummel v. Estelle, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), Justice Kennedy identified five principles encompassed within the proportionality rule. The first is that "the fixing of prison terms for specific crimes involves a substantive penological judgment that, as a general matter, is properly within the province of legislatures, not courts." Harmelin, 501 U.S. at 998, 111 S.Ct. 2680. As a reviewing court, we are required to grant substantial deference to the legislature's broad authority to determine an appropriate punishment. Solem, 463 U.S. at 290, 103 S.Ct. 3001.
"The second principle is that the Eighth Amendment does not mandate adoption of any one penological theory." Harmelin, 501 U.S. at 999, 111 S.Ct. 2680 (Kennedy, J., concurring). From the second principle flows the third, which recognizes the role of a state in our federal system. The state has an independent power to set forth societal norms through the use of criminal law. This power "may yield different, yet rational, conclusions regarding the appropriate length of prison terms for particular crimes." Id. at 1000, 111 S.Ct. 2680.
The fourth principle requires that proportionality review be directed by objective factors. The type of punishment imposed, Justice Kennedy stated, is the "most prominent objective factor." Id. Unfortunately, when confronted by a sentence for a term of years, Justice Kennedy noted that "our decisions recognize we lack clear objective standards to distinguish between sentences for different terms of years." Id. at 1001, 111 S.Ct. 2680. Finally, "The Eighth Amendment does not require strict proportionality between crime and sentence. Rather, it forbids only extreme sentences that are grossly disproportionate to the crime." Id.
Applying these principles, we find that the Florida Legislature has fixed the second most severe penalty to the most severe crime recognized by our law. The responsibility for making this choice rests with the legislature and is entitled to substantial deference. Further, we recognize that not every citizen nor even every member of this court will agree with the penalty established by the legislature for this crime as applied to this offender, but the legislative determination falls within the bounds of a rational conclusion regarding an appropriate prison term for the crime of first-degree murder. Finally, we find *718 that the penalty of life imprisonment is not grossly disproportionate to the crime of first-degree murder. If, as Justice Kennedy's opinion noted, "the crime of felony murder without specific intent to kill ... [is] a crime for which no sentence of imprisonment would be disproportionate," id. at 1004, 111 S.Ct. 2680 then the sentence of life imprisonment for the specific intent crime of first-degree murder cannot be disproportionate. Accordingly, we hold that Mr. Phillips' sentence does not violate the proportionality principle mandated by the Eighth Amendment.
A final issue in this analysis is whether Mr. Phillips' chronological age is a factor that must be considered in a proportionality review under Harmelin and Solem. We hold that his age is a factor that must be considered. In Eddings v. Oklahoma, 455 U.S. 104, 116, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the Supreme Court found the defendant's chronological age a mitigating factor in death penalty cases, and in State v. Green, 348 N.C. 588, 502 S.E.2d 819 (1998), the Supreme Court of North Carolina reviewed a sentence of life imprisonment without possibility of parole imposed upon a thirteen-year-old rapist and held that chronological age can be considered in determining whether a punishment is grossly disproportionate to the crime. This approach was followed in Hawkins v. Hargett, 200 F.3d 1279, 1283-84 (10th Cir.1999). We agree with the conclusions reached in Green and Hawkins. We further agree with Green and Hawkins that although Mr. Phillips' culpability may be diminished somewhat because of his age at the time of the commission of the crime, the factor of his age is outweighed by his heinous conduct and the ultimate harmdeaththat he inflicted upon his victim. Clearly, our society "attaches moral significance to consequences as well as to states of mind." Rice v. Cooper, 148 F.3d 747, 752 (7th Cir.1998).
We reach the same result as in Hawkins, Green, and Rice and hold that even factoring in Mr. Phillips' chronological age there has been no Eighth Amendment violation.[4]

FLORIDA CONSTITUTION
Excessive, cruel, or unusual punishments have been expressly prohibited by the Florida Constitution, past and present. The Florida Constitution of 1838 specifically proscribed excessive bails and fines, and added: "nor shall cruel or unusual punishments be inflicted."[5] In its present form the prohibition is inscribed in article I, section 17, of the Florida Constitution, which provides:
Excessive punishments. Excessive fines, cruel or unusual punishment, attainder, forfeiture of estate, indefinite imprisonment, and unreasonable detention of witnesses are forbidden.
Because the clause contains the conjunction "or," it has been interpreted to mean that our state's constitutional framers intended alternative prohibitions or guarantees. The use of the disjunctive provides protection against both "cruel punishments" and "unusual punishments." Allen v. State, 636 So.2d 494, 497 n. 5 (Fla.1994); *719 Tillman v. State, 591 So.2d 167, 169 n. 7 (Fla.1991); see also Armstrong v. Harris, 773 So.2d 7, 17 n. 26 (Fla.2000), cert. denied, 532 U.S. 958, 121 S.Ct. 1487, 149 L.Ed.2d 374 (2001).[6] Thus, the Florida Constitution provides a greater freedom in this regard than does the federal. "In short: `[T]he federal Constitution ... represents the floor for basic freedoms; the state constitution, the ceiling.'" Traylor v. State, 596 So.2d 957, 962 (Fla.1992) (quoted in Armstrong, 773 So.2d at 17).[7]
Although the concept that the Florida Constitution provides a ceiling for basic freedoms has been outlined by the Florida Supreme Court in Traylor and Armstrong, the court has not fully delineated the contours of those rights in other cases. By and large, the Florida analysis of what constitutes a "cruel or unusual" penalty has followed the federal "cruel and unusual" analysis,[8] and we must now attempt to discern whether Mr. Phillips' punishment violates these Florida guarantees.
Section 985.221(1)(a), Florida Statutes (1997), requires a child "to be tried and handled in every respect as an adult" where the offense is, as here, punishable by life imprisonment. Thus, the Florida Legislature clearly intended that the sanction of life imprisonment without parole be imposed for first-degree murder regardless of whether the offender is an adult or a child. "There is little question that Florida has a long history of imposing lengthy prison sentences for many offenses." Gibson v. State, 721 So.2d 363, 369 (Fla. 2d DCA 1998) (collecting cases from Florida and other jurisdictions). First-degree murder is one of those offenses that traditionally has had affixed to it a lengthy, if not the longest, term of years in prison. Even crimes that do not involve the ultimate harm to the victimdeathcarry long prison sentences. For example, in Gibson, this court upheld, against a cruel or unusual challenge, life imprisonment without parole for the crime of sexual battery. Id. Thus, life imprisonment without the possibility of parole for the crime of first-degree murder cannot be said to be cruel.
Furthermore, "[s]entences imposed on juveniles of life imprisonment are not uncommon in Florida [c]ourts." Blackshear v. State, 771 So.2d 1199, 1201 (Fla. 4th *720 DCA 2000). Recent tragic crimes involving juvenile perpetrators have received prominent media attention, prompting a belief that this punishment is even more prevalent today than in the past. In Allen, 636 So.2d 494, the Florida Supreme Court held the death penalty to be cruel or unusual punishment if imposed on a person under sixteen years of age, grounding its reasoning largely upon the historical fact that more than fifty years had elapsed since that penalty had been imposed. For the sentence of life without possibility of parole, however, there has been no similar lapse. For example, in the recent case of Colon v. Irwin, 732 So.2d 428, 428 (Fla. 5th DCA 1999), we learn that "Colon is a juvenile serving a term of his natural life in prison." In sum, Joshua Phillips' sentence for this crime cannot be said to be unusual punishment.[9]
Accordingly, we hold that Mr. Phillips' sentence of life imprisonment without possibility of parole does not violate the alternative prohibitions against cruel or unusual punishments emanating from article I, section 17, of the Florida Constitution.
Judgments and sentences affirmed.
BLUE, C.J., and WHATLEY, J., Concur.
NOTES
[1] Two antecedents of our Eighth Amendment's cruel and unusual prohibition were the English Bill of Rights of 1689 and the Virginia Declaration of Rights of 1776. See 1 Bernard Schwartz, The Bill of Rights: A Documentary History 40-46, 234-36 (Chelsea House 1971).
[2] We refer to this crime as noncapital even though first-degree murder is punishable by death in other situations. As to young offenders, however, the United State Supreme Court, in Thompson v. Oklahoma, 487 U.S. 815, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988), held that the Eighth and Fourteenth Amendments prohibited the execution of a defendant convicted of first-degree murder committed when he was fifteen years old. In Allen v. State, 636 So.2d 494 (Fla.1994), the Florida Supreme Court held that the death penalty was unconstitutional under article I, section 17, of the Florida Constitution if imposed upon a defendant who was under the age of sixteen at the time of the crime. Following Allen, the Florida Supreme Court held in Brennan v. State, 754 So.2d 1, 7 (Fla. 1999), that "our decision in Allen interpreting the Florida Constitution compels the finding that the death penalty is cruel or unusual if imposed on a defendant under the age of seventeen." Thus, the death penalty was not available for the crime committed by Joshua Phillips at the age of fourteen, and the analysis for noncapital crimes is relevant.
[3] Although a number of courts, both federal and state, have interpreted Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), as overruling Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), the Florida Supreme Court has specifically rejected that view. The court noted in Hale v. State, 630 So.2d 521, 525 (Fla.1993), that the confusion over the status of Solem is an outgrowth of the "fractured nature" of the opinion. Only two members of the majority would have voted to overrule Solem and its proportionality analysis. In contrast, "seven members of the United States Supreme Court reaffirmed in Harmelin that the federal `cruel and unusual' clause prohibits disproportionate prison sentences for noncapital crimes." Hale, 630 So.2d at 525. See also Gibson v. State, 721 So.2d 363 (Fla. 2d DCA 1998) (applying proportionality analysis to mandatory sentence of life without possibility of parole for the crime of penile union with vagina of girl less than twelve years of age).
[4] As noted in Andrade v. California, 270 F.3d 743, 770 n. 1 (9th Cir.2001) (Sneed, J., concurring in part and dissenting in part), in the "decade since Harmelin was decided, only one sentence has been struck down as proscribed by the Eighth Amendment to the U.S. Constitution." The defendant in Henderson v. Norris, 258 F.3d 706 (8th Cir.2001), was a first-time drug offender, not a violent murderer.
[5] Art. I, § 12, Fla. Const. of 1838 (quoted in Armstrong v. Harris, 773 So.2d 7, 17 (Fla. 2000), cert. denied, 532 U.S. 958, 121 S.Ct. 1487, 149 L.Ed.2d 374 (2001)).
[6] For an explanation of the meaning of "or," see Cherry Lake Farms, Inc. v. Love, 129 Fla. 469, 176 So. 486, 488 (1937).
[7] Although the voters approved an amendment to article I, section 17, on November 3, 1998, that would have changed the relevant proscription to "cruel and unusual" punishment, the Florida Supreme Court struck down the amendment in Armstrong v. Harris, 773 So.2d at 17, on the ground that the ballot summary did not accurately represent the amendment. Ironically, the date on which the voters approved the amendment was the date on which Joshua Phillips committed this crime.
[8] See, e.g., Blackshear v. State, 771 So.2d 1199, 1201 (Fla. 4th DCA 2000) (holding, in the face of Blackshear's allegation that his life sentences for crimes he committed at age thirteen constituted cruel and unusual punishment, that "[e]ven considering his age, appellant's sentence is not grossly disproportionate"); Brown v. State, 565 So.2d 369, 371 (Fla. 1st DCA 1990) ("[T]his court has previously held that the imposition of a life sentence without possibility of parole does not constitute cruel and unusual punishment. Bloodworth v. State, 504 So.2d 495 (Fla. 1st DCA 1987)."); Kendry v. State, 517 So.2d 78 (Fla. 1st DCA 1987) (holding that a sentence of life without possibility of parole for twenty-five years for sexual battery on a ten-year-old child did not constitute cruel and unusual punishment as prohibited by the Eighth Amendment and the Florida Constitution); Cole v. State, 262 So.2d 902, 903 (Fla. 3d DCA 1972) ("The fact that a sentence imposed upon conviction for an offense is for the maximum provided by law furnishes no basis to hold it is cruel and unusual punishment.").
[9] We note, although it is of no significance to our constitutional analysis, that if we were to declare Mr. Phillips' penalty unconstitutional there would remain no legislatively formulated sentence for the court to impose.