982 So.2d 43 (2008)
Terrance Jamar GRAHAM, Appellant,
v.
STATE of Florida, Appellee.
No. 1D06-3190.
District Court of Appeal of Florida, First District.
April 10, 2008.
Rehearing Denied May 16, 2008.
*44 Bryan S. Gowdy and John S. Mills of Mills & Creed, P.A., Jacksonville, for Appellant.
Bill McCollum, Attorney General, and Joshua R. Heller, Assistant Attorney General, Tallahassee, for Appellee.
WOLF, J.
Appellant raises a number of issues on appeal. We affirm as to all of the issues; however, we write to address appellant's assertion that his sentence of life imprisonment without the possibility of parole for a *45 crime committed as a juvenile violates the federal and Florida prohibitions against cruel and unusual punishment.
At the age of sixteen, appellant was charged with (1) armed burglary with assault or battery (a first-degree life felony) and (2) attempted armed robbery (a second-degree felony) for an incident involving the robbery of a local restaurant in which his codefendant assaulted the restaurant owner with a pipe. Appellant pled guilty to the offenses in return for the court withholding adjudication and three years' probation with the condition that he serve twelve months in a pre-trial detention facility.
Appellant served his twelve-month sentence and was released from jail on June 25, 2004. In December 2004, an affidavit of violation of probation was filed alleging appellant committed new law offenses to include armed home invasion robbery. At the violation of probation hearing, the State presented evidence establishing that appellant and two codefendants entered the victim's apartment forcefully and that, while appellant held the victim at gunpoint, his codefendants robbed the home. After completing the robbery, appellant and his codefendants locked the victim in a closet. Shortly after leaving the scene of the incident, appellant was involved in a lengthy car chase with the police through a residential neighborhood. After his arrest, appellant was asked about similar robberies in the same vicinity, and officers assert appellant conceded he was involved in "two or three before tonight."
Following the probation hearing, the trial court found appellant guilty of the alleged violations and sentenced him to life imprisonment without the possibility of parole. Appellant was nineteen years old at the time of his sentencing. The trial court announced its reasoning behind the sentence and stated in pertinent part:
Mr. Graham, as I look back on your case, yours is really candidly a sad situation. You had, as far as I can tell, you have quite a family structure. You had a lot of people who wanted to try and help you get your life turned around including the court system, and you had a judge who took the step to try and give you direction through his probation order to give you a chance to get back onto track. And at the time you seemed through your letters that that is exactly what you wanted to do. And I don't know why it is that you threw your life away. I don't know why.
But you did, and that is what is so sad about this today is that you have actually been given a chance to get through this, the original charge, which were very serious charges to begin with. The attempted robbery with a weapon was a very serious charge.
. . . .
[I]in a very short period of time you were back before the Court on a violation of this probation, and then here you are two years later standing before me, literally the  facing a life sentence as to  up to life as to count 1 and up to 15 years as to count 2.
And I don't understand why you would be given such a great opportunity to do something with your life and why you would throw it away. The only thing that I can rationalize is that you decided that this is how you were going to lead your life and there is nothing that we can do for you. And as the state pointed out, that this is an escalating pattern of criminal conduct on your part and that we can't help you any further.
We can't do anything to deter you. This is the way you are going to lead your life, and I don't know why you are going to. You've made that decision. I have *46 no idea. But, evidently, that is what you decided to do.
So then it becomes a focus, if I can't do anything to help you, if I can't do anything to get you back on the right path, then I have to start focusing on the community and trying to protect the community from your actions. And unfortunately, that is where we are today is I don't see where I can do anything to help you any further. You've evidently decided this is the direction you're going to take in life, and it's unfortunate that you made that choice.
I have reviewed the statute. I don't see where any further juvenile sanctions would be appropriate. I don't see where any youthful offender sanctions would be appropriate. Given your escalating pattern of criminal conduct, it is apparent to the Court that you have decided that this is the way you are going to live your life and that the only thing I can do now is to try to protect the community from your actions.
On November 5, 2002, the Florida voters amended article I, section 17 of the Florida Constitution mandating that Florida's ban on cruel and unusual punishment be construed in conformity with the United State Supreme Court's construction of the Eighth Amendment. In his initial brief, appellant asserts both a facial and an as applied constitutional challenge to his mandatory life sentence.

I. Facial Challenge
Appellant's facial challenge to the statute authorizing life imprisonment of juveniles is based on two main components. First, appellant asserts the use of true life sentences on juveniles should be per se banned pursuant to the United States Supreme Court's holding in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), as well as other state court precedent striking similar sentences. Second, appellant asserts the use of the sentence violates international norms, as well as the United Nations International Covenant on Civil and Political Rights (ICCPR), a treaty to which the United States has become a party.

A. Per se invalid based on Roper and other state precedent
Appellant relies heavily on dicta found in the United States Supreme Court's opinion Roper, 543 U.S. at 551, 125 S.Ct. 1183, to support his instant argument. In Roper, the Supreme Court found the imposition of the death penalty on juveniles to be per se unconstitutional for several reasons. First, the court determined that the use of the death penalty on juvenile offenders had become truly unusual as contemplated by the Eighth Amendment because of (1) the current trend by state legislatures to ban the use of the death penalty on juveniles and (2) the lack of the death penalty's use on juveniles in those states that did legalize the sentence. Roper, 543 U.S. at 561-68, 125 S.Ct. 1183. Second, the Supreme Court noted that the death penalty could be used only for those committing a "`narrow category of the most serious crimes' and whose extreme culpability makes them `the most deserving of execution.'" Id. at 568, 125 S.Ct. 1183 (citing Atkins v. Virginia, 536 U.S. 304, 319, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)). Based on the foregoing, the Supreme Court necessarily excluded juveniles from this category because juveniles, in the struggle to find themselves and determine their character, are more susceptible to morally reprehensible behavior, but are less likely to have "irretrievably depraved character." Roper, 543 U.S. at 570, 125 S.Ct. 1183. Third, the Supreme Court found that, while the overwhelming weight of international opinion against the juvenile death penalty is not controlling, it provided significant confirmation *47 that the imposition of the death penalty on juveniles was a grossly disproportionate sentence for offenders under the age of eighteen. Id. at 576-77, 125 S.Ct. 1183.
Appellant ignores the largest and most evident distinguishing factor of the Roper opinion. As the State points out, "death is different." See also United States v. Feemster, 483 F.3d 583, 588 (8th Cir.2007); vacated on other grounds, ___ U.S. ___, 128 S.Ct. 880, 169 L.Ed.2d 718 (2008) (noting that life imprisonment for a juvenile is not cruel and unusual while acknowledging that the Eighth Amendment applies to death penalty cases with "special force") (citing Roper, 543 U.S. at 568, 125 S.Ct. 1183); United States v. Salahuddin, 509 F.3d 858 (7th Cir.2007) (limiting the holding of Roper to death penalty cases and upholding the imposition of a life sentence on a juvenile); Culpepper v. McDonough, 2007 WL 2050970, *4-5 (M.D.Fla. July 13, 2007) (holding that the imposition of a life sentence on a juvenile does not violate the holding of Roper); Douma v. Workman, 2007 WL 2331883, *3 (N.D.Okla.2007) (affirming appellant's juvenile sentence of life imprisonment without the possibility of parole and stating "the scope of Roper is narrow: it applies only where an individual under 18 years of age is sentenced to death"). Relying on the sound reasoning outlined in the foregoing precedent, we reject appellant's invitation to extend the holding of Roper to prohibit the sentencing of juveniles to life imprisonment in all situations.
The United States Supreme Court and the Florida Supreme Court have expressly stated that a challenge to the length of years sentenced must rest on a determination of whether the sentence is grossly disproportionate to the crime. In Adaway v. State, 902 So.2d 746, 749 (Fla.2005), the Florida Supreme Court held that "to violate the Cruel and Unusual Punishment Clause, a prison sentence must, at least, be grossly disproportionate to the crime." Specifically, in Adaway, the Florida Supreme Court considered and rejected a challenge to appellant's life sentence without the possibility of parole for sexual battery on a child under the age of twelve. Id. In considering appellant's Eighth Amendment argument, the supreme court noted:
The United States Supreme Court has not reached a majority consensus on the standard for determining the constitutionality of long prison sentences. See Ewing v. California, 538 U.S. 11, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003) (plurality opinion); Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (plurality opinion). The Court has acknowledged that "in determining whether a particular sentence for a term of years can violate the Eighth Amendment, we have not established a clear or consistent path for courts to follow." Lockyer v. Andrade, 538 U.S. 63, 72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). A majority of the Court recently agreed, however, that "[t]hrough this thicket of Eighth Amendment jurisprudence, one governing legal principle emerges as `clearly established'"  namely, that a "gross disproportionality principle is applicable to sentences for terms of years." Id. (quoting 28 U.S.C. § 2254(d)(1)).
Adaway, 902 So.2d at 748-49 (emphasis added). Further, in Solem v. Helm, 463 U.S. 277, 292, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), the United States Supreme Court announced objective criteria to be used in a "grossly disproportionate" consideration and looked specifically at: (1) the gravity of the offense and the harshness of the penalty; (2) the sentences imposed on other criminals in the same jurisdiction; *48 and (3) the sentences imposed for commission of the same crime in other jurisdictions.
Because the weight of applicable precedent requires a fact-specific inquiry into the "grossly disproportionate" analysis, this type of constitutional argument does not lend itself to a facial challenge. To state that the imposition of a life sentence without parole on a juvenile is per se violative of the Eighth Amendment, a court would have to reject existing Supreme Court precedent regarding the factual inquiry required in such a case. As such, it does not appear that the United States Supreme Court contemplated this type of per se prohibition to a specific term of years.
In addition to the above assertion, appellant further argues that non-binding state court precedent establishes that the use of life sentences without parole in juvenile cases has become unusual as defined by the Eighth Amendment and, thus, should be per se barred. Based on a review of these cases, we do not agree.
First, each of the state court cases cited by appellant involves an as applied consideration of appellant's sentencing claim. There is no per se rule in any state rejecting the use of life sentences for juveniles in every case; each of the cases cited by appellant involves a fact-specific inquiry into the disproportionate nature of the sentence imposed to the nature of the offense and/or the appellant's age. See People v. Miller, 202 Ill.2d 328, 269 Ill.Dec. 503, 781 N.E.2d 300, 302-08 (2002) (holding that the imposition of a life sentence without parole for a fifteen-year-old juvenile's offense of acting as a lookout during the commission of multiple murders would violate Illinois's constitutional equivalent of the Eighth Amendment as applied to appellant, but acknowledging the legality of the sentence's use against juveniles guilty of committing more heinous crimes); Naovarath v. State, 105 Nev. 525, 779 P.2d 944, 946-47 (1989) (invalidating the use of a true life sentence imposed on a thirteen-year-old convicted of killing his molester after considering appellant's age and mental condition at the time of the killing); Workman v. Commonwealth, 429 S.W.2d 374, 377-78 (Ky.Ct.App.1968) (holding that the imposition of a true life sentence on two fourteen-year-old offenders for committing the crime of rape was violative of the Eighth Amendment prohibition on cruel and unusual punishment); People v. Dillon, 34 Cal.3d 441, 194 Cal.Rptr. 390, 668 P.2d 697, 726-27 (1983) (holding that the imposition of a true life sentence on a minor convicted of felony murder was cruel and unusual based on the specific circumstances surrounding the offense).
Additionally, several courts have upheld the imposition of a life sentence for a juvenile utilizing a similar disproportionality analysis. In Tate v. State, 864 So.2d 44, 54 (Fla. 4th DCA 2003), the Fourth District considered a juvenile's challenge to the imposition of a true life sentence for his brutal murder of a six-year-old child and stated in pertinent part:
And, finally, we reject the argument that a life sentence without the possibility of parole is cruel or unusual punishment on a twelve-year-old child and that it violates Article I, Section 17 of the Florida Constitution and the Eighth Amendment of the United States Constitution. Tate argues that his sentence is greatly disproportionate to the sentences of other juveniles charged with similar acts.
In Blackshear v. State, 771 So.2d 1199 (Fla. 4th DCA 2000), this court rejected a cruel or unusual punishment challenge to three consecutive life sentences imposed for three robberies committed when Blackshear was thirteen. Id. at 1200. Upon his guilty plea, Blackshear *49 was certified as an adult and placed on probation. Id. When he violated his probation at age twenty, he was sentenced to three consecutive life sentences. Id. There, we recognized that "[s]entences imposed on juveniles [as adults] of life imprisonment are not uncommon in Florida Courts." Id. at 1201-02.
In Phillips v. State, 807 So.2d 713 (Fla. 2d DCA 2002), the defendant was fourteen years old at the time he murdered an eight year old child. He was convicted of first-degree murder and sentenced to life imprisonment without the possibility of parole. Id. at 714. . . . In concluding that there was no violation of proportionality, the Phillips court noted:
The responsibility for making this choice rests with the legislature and is entitled to substantial deference. Further, we recognize that not every citizen nor even every member of this court will agree with the penalty established by the legislature for this crime as applied to this offender, but the legislative determination falls within the bounds of a rational conclusion regarding an appropriate prison term for the crime of first-degree murder. Finally, we find that the penalty of life imprisonment is not grossly disproportionate to the crime of first-degree murder. If, as Justice Kennedy's opinion noted, "the crime of felony murder without specific intent to kill . . . [is] a crime for which no sentence of imprisonment would be disproportionate," [Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) ] [ ] then the sentence of life imprisonment for the specific intent crime of first-degree murder cannot be disproportionate. Accordingly, we hold that Mr. Phillips' sentence does not violate the proportionality principle mandated by the Eighth Amendment.
See also People v. Launsburry, 217 Mich.App. 358, 551 N.W.2d 460, 463-64 (1996) (holding life in prison without the possibility of parole was not cruel and unusual punishment for juvenile convicted of murder); State v. Massey, 60 Wash. App. 131, 803 P.2d 340, 348 (1990) (approving true life sentence imposed on youth convicted of committing murder at thirteen years of age), overruled on other grounds by State v. Broadaway, 133 Wash.2d 118, 942 P.2d 363 (1997). These cases make clear that the imposition of a true life sentence on a juvenile has never, in state or federal courts, been considered per se unlawful. Accordingly, appellant cannot assert that established precedent supports a conclusion that the use of the sentence has become so unique as to be unusual as defined by the Eighth Amendment.

B. Per se invalid as contrary to international norms
As his last facial challenge, appellant asserts the use of the sentence violates international norms as well as the ICCPR treaty. In his brief, appellant states that "only fourteen nations, in theory, allow for juveniles to be sentenced to life, and only three of those nations appear to do so in practice." See also Human Rights Watch and Amnesty International, The Rest of their Lives: Life Without Parole for Child Offenders in the United States, at 111-16 (Oct.2005), available at http://hrw.org/reports/2005/us1005/ (last visited March 12, 2008). Appellant further notes that, outside the United States, the number of persons serving life sentences for juvenile crimes is approximately a dozen and that the United Kingdom has recently per se barred the imposition of such a sentence in Singh v. United Kingdom, 1 BHRC 119, 22 EHRR 1 (1996). See id. at 106. Appellant points out that the United *50 States currently has 2,225 persons sentenced to life for juvenile crimes; Florida houses 273 such persons. Id. This court acknowledges that, above all others, this argument is the strongest in support of a per se ban on the use of a true life sentence for juveniles. Specifically, in Roper, the United States Supreme Court discussed the weight to be given international pressure to change our existing legal system and noted:
Our determination that the death penalty is disproportionate punishment for offenders under 18 finds confirmation in the stark reality that the United States is the only country in the world that continues to give official sanction to the juvenile death penalty. This reality does not become controlling, for the task of interpreting the Eighth Amendment remains our responsibility. Yet at least from the time of the Court's decision in Trop [v. Dulles], the Court has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of "cruel and unusual punishments." 356 U.S. [86], at 102-103, 78 S.Ct. 590 [2 L.Ed.2d 630 (1958)] (plurality opinion) ("The civilized nations of the world are in virtual unanimity that statelessness is not to be imposed as punishment for crime"); see also Atkins, supra, at 317, n. 21, 122 S.Ct. 2242 (recognizing that "within the world community, the imposition of the death penalty for crimes committed by mentally retarded offenders is overwhelmingly disapproved"); Thompson [v. Oklahoma, 487 U.S. 815], supra, at 830-831, and n. 31, 108 S.Ct. 2687 [101 L.Ed.2d 702 (1988)] (plurality opinion) (noting the abolition of the juvenile death penalty "by other nations that share our Anglo-American heritage, and by the leading members of the Western European community," and observing that "[w]e have previously recognized the relevance of the views of the international community in determining whether a punishment is cruel and unusual"); Enmund [v. Florida, 458 U.S. 782], supra, at 796-797, n. 22, 102 S.Ct. 3368 [73 L.Ed.2d 1140 (1982)] (observing that "the doctrine of felony murder has been abolished in England and India, severely restricted in Canada and a number of other Commonwealth countries, and is unknown in continental Europe"); Coker [v. Georgia, 433 U.S. 584], supra, at 596, n. 10, 97 S.Ct. 2861 [53 L.Ed.2d 982 (1977)] (plurality opinion) ("It is . . . not irrelevant here that out of 60 major nations in the world surveyed in 1965, only 3 retained the death penalty for rape where death did not ensue").
. . . .
Over time, from one generation to the next, the Constitution has come to earn the high respect and even, as Madison dared to hope, the veneration of the American people. See The Federalist No. 49, p. 314 (C. Rossiter ed. 1961). The document sets forth, and rests upon, innovative principles original to the American experience, such as federalism; a proven balance in political mechanisms through separation of powers; specific guarantees for the accused in criminal cases; and broad provisions to secure individual freedom and preserve human dignity. These doctrines and guarantees are central to the American experience and remain essential to our present-day self-definition and national identity. Not the least of the reasons we honor the Constitution, then, is because we know it to be our own. It does not lessen our fidelity to the Constitution or our pride in its origins to acknowledge that the express affirmation of certain fundamental rights by other nations and peoples simply underscores *51 the centrality of those same rights within our own heritage of freedom.
543 U.S. at 575-76, 125 S.Ct. 1183.
Similar to the imposition of the death penalty on juvenile offenders, the sentencing of a juvenile to a true life sentence is frowned upon by the international community. However, in Roper, the United States Supreme Court further noted that it is for the courts of the United States, not the international or community courts, to interpret the Eighth Amendment's protections. 543 U.S. at 575-77, 125 S.Ct. 1183. As such, international pressure must be balanced with the due deference owed the state legislatures of this country in matters of sentencing. Specifically, any analysis applying the Eighth Amendment must provide due deference to "the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals." Solem, 463 U.S. at 290, 103 S.Ct. 3001. While the weight given the international community is persuasive, it cannot be said to counter the individual rights of the state to impose its chosen sentencing scheme if that scheme is not held to be otherwise unconstitutional.

II. As Applied Challenge

A. As applied to appellant, the life sentence is grossly disproportionate to his offense
Appellant asserts his particular sentence is "grossly disproportionate" to his offense and, thus, violates the Eighth Amendment's ban on cruel and unusual punishment. Based on the Solem disproportionality analysis, we do not agree.
In Blackshear, 771 So.2d at 1199, the Fourth District considered a nearly identical challenge to the Eighth Amendment by an appellant who had been a juvenile upon the commission of his underlying offense, who subsequently violated his probation through the commission of several robberies, and was resentenced for the original offense at the age of twenty. In Blackshear, the Fourth District affirmed the imposition of a life sentence and noted in pertinent part:
Appellant also complains that his life sentences, imposed for crimes he committed at age thirteen, amount to cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution and Article I, Section 17, of the Florida Constitution. However, when appellant committed his crimes and was certified as an adult, he was placed on probation, not sentenced to life imprisonment as he could have been under the sentencing guidelines. The life sentences were imposed only after the violation of probation, when appellant was twenty years old. Thus, appellant was sentenced at age twenty for crimes that the legislature has authorized a sentence of life imprisonment. See Hale v. State, 630 So.2d 521, 526 (Fla.1993)(length of sentence imposed is matter of legislative prerogative).
Even considering age, appellant's sentence is not grossly disproportionate. Appellant was originally charged and sentenced as an adult and did not object. The crimes to which he pled were serious, violent crimes. By his plea and sentence to probation, he was given an opportunity to avoid incarceration by successfully completing his probation, which he did not. Instead he was arrested for possession of a firearm in violation of his probation. Finally, the life sentence was imposed for a violation of probation at age twenty. Not only was the sentence *52 imposed for three different armed burglaries, but appellant also had a long history of other convictions, including five for strong armed robbery, many convictions for burglary, grand theft, and additional misdemeanors.
Sentences imposed on juveniles of life imprisonment are not uncommon in Florida Courts. See, e.g., Ritchie v. State, 651 So.2d 167 (Fla. 1st DCA 1995)(upholding a juvenile's life sentence for a second degree murder conviction); Colon v. Irwin, 732 So.2d 428 (Fla. 5th DCA 1999)(addressing a juvenile's petition for writ of mandamus to release documents who had been sentenced to life for first degree murder); Manuel v. State, 629 So.2d 1052 (Fla. 2nd DCA 1993)(remanding to consider whether thirteen year old sentenced to life had counsel for prior juvenile convictions included in scoresheet which recommended life sentence for attempted murder and armed robbery). Other states have also explicitly upheld similar sentences. See, e.g., State v. Walker, 252 Kan. 117, 843 P.2d 203 (1992)(life sentence for fourteen year old active participant in two aggravated kidnapings and an aggravated arson); State v. Foley, 456 So.2d 979 (La.1984) (fifteen year old's life sentence without the possibility of parole for aggravated rape proportional); White v. State, 374 So.2d 843 (Miss.1979)(life without possibility of parole for sixteen year old armed robber and kidnaper); People v. Isitt, 55 Cal. App.3d 23, 127 Cal.Rptr. 279 (1976)(seventeen year old sentenced to life without parole for kidnaping and robbery with bodily harm); Rogers v. State, 257 Ark. 144, 515 S.W.2d 79 (1974)(seventeen year old first time offender rapist sentenced to life without possibility of parole); Howard v. State, 319 So.2d 219 (Miss.1975)(sixteen year old's twenty-five year sentence for attempted armed robbery not cruel and unusual); State v. Haley, 87 Ariz. 29, 347 P.2d 692 (1959)(not cruel and inhuman to sentence fifteen year old who committed robbery, aggravated assault, and lewd and lascivious acts to twenty-three to thirty years).
771 So.2d at 1201-02 (emphasis added). The reasoning in Blackshear is sound and highly relevant to the current appeal. In his "disproportionate" argument, appellant emphasizes that he was sixteen at the time of the commission of his original offense and that the offense involved a restaurant burglary in which he personally injured no one. However, this argument glosses over the record facts which establish that, after being placed on probation  an extremely lenient sentence for the commission of a life felony  appellant committed at least two armed robberies and confessed to the commission of an additional three. These offenses were not committed by a pre-teen, but a seventeen-year-old who was ultimately sentenced at the age of nineteen. Additionally, these robberies involved the use of a weapon, and appellant himself held a gun to a man's head during the incident for which he was violated.
While the United States Supreme Court has noted that juveniles in general are more amenable to successful rehabilitation, the particular facts of this case cut against rehabilitation for appellant. As the trial court noted in its sentencing colloquy, appellant was given an unheard of probationary sentence for a life felony, he wrote a letter expressing his remorse and promising to refrain from the commission of further crime, and he had a strong family structure to support him. However, appellant rejected his second chance and chose to continue committing crimes at an escalating pace.
*53 It is the tested theory of rehabilitation on appellant that sets this case apart from other challenges to a juvenile's life sentence. There is record evidence to support appellant's inability to rehabilitate  evidence that is usually not available upon an original sentencing proceeding. The trial court balanced the possibility of appellant's rehabilitation with the safety of society in determining his sentence and was well within its discretion to do so. Accordingly, while appellant is correct that a true life sentence is typically reserved for juveniles guilty of more heinous crimes such as homicide, none of the cases cited by appellant involved a tested theory of rehabilitation. See Tate, 864 So.2d at 46-47, 54-55; Phillips, 807 So.2d at 713. Based on Blackshear, the gravity of appellant's crimes, as well as the treatment of like juveniles, supports the imposition of appellant's true life sentence premised on a Solem factor analysis. As such, similar to the defendant in Blackshear and based on the particular facts of this case, appellant's sentence does not violate either the Florida or the United States Constitutions' ban on cruel and unusual punishment.

B. International treaty violation
Appellant further asserts the imposition of such a sentence violates the ICCPR, an international treaty ratified by the United States in 1966. Even if appellant has standing to personally invoke the provisions of the ICCPR (compare Hanoch Tel-Oren v. Libyan Arab Republic, 517 F.Supp. 542, 545-47 (D.D.C.1981) (holding that the defendant lacked standing to challenge the death penalty based on the ICCPR because treaties apply only to disputes between sovereign governments), with United States v. Duarte-Acero, 208 F.3d 1282, 1286 (11th Cir.2000) (holding that "[t]he clear language of the ICCPR manifests that its provisions are to govern the relationship between an individual and his state")), a plain reading of the ICCPR does not support appellant's contention. While the ICCPR's juvenile provisions (1) emphasize the rehabilitation and education of juveniles; (2) require the separation of child offenders from adults; and (3) require that the provisions of treatment be appropriate to the child's age, upon ratifying the ICCPR, the U.S. Senate attached the following limiting reservation:
(5) That the policy and practice of the United States are generally in compliance with and supportive of the [ICCPR's] provisions regarding treatment of juveniles in the criminal justice system. Nevertheless, the United States reserves the right, in exceptional circumstances, to treat juveniles as adults, notwithstanding paragraphs 2(b) and 3 of Article 10 and paragraph 4 of Article 14. . . .
See 138 Cong. Rec. S4781-01 (daily ed. April 2, 1992) (Emphasis added). Appellant asserts that the term "exceptional circumstances" in the above reservation indicates that the United States' ratification of the ICCPR prohibits appellant's sentence in this case.
In Kane v. Winn, 319 F.Supp.2d 162, 196 (D.Mass.2004), the Massachusetts district court considered the ICCPR as well as other treaties when discussing the rights of prisoners to be heard following disciplinary actions; the court stated in pertinent part:
Treaties are as legally binding as federal statutes, and if a treaty and a federal statute conflict, the later in time is controlling. See United States v. Dion, 476 U.S. 734, 738, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986); Trans World Airlines, Inc. v. Franklin Mint Corp., 466 U.S. 243, 252, 104 S.Ct. 1776, 80 L.Ed.2d 273 (1984); Chae Chan Ping v. U.S., 130 U.S. 581, 600, 602-03, 9 S.Ct. 623, 32 L.Ed. 1068 (1889); Whitney v. Robertson, *54 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888); Edye v. Robertson (Head Money Cases), 112 U.S. 580, 597-99, 5 S.Ct. 247, 28 L.Ed. 798 (1884). At the same time a treaty can only be directly applied in a case if it is self-executing  that is, if the provisions "act directly" on the issues in question, rather than merely "pledge the faith of the United States to pass acts which shall ratify and confirm them." Foster v. Neilson, 27 U.S. (2 Pet.) 253, 314, 7 L.Ed. 415 (1829), overruled in part on other grounds, United States v. Percheman, 32 U.S. (7 Pet.) 51, 89, 8 L.Ed. 604 (1833). If the treaty is non-self-executing, it "addresses itself to the political, not the judicial department; and the legislature must execute the contract before it can become a rule for the Court." Foster, 27 U.S. (2 Pet.) at 254.
Even when a treaty is not self-executing, courts must strive not to interpret statutes to conflict with the international obligations expressed in such a treaty. See Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804) ("[A]n act of congress ought never to be construed to violate the law of nations if any other possible construction remains. . . ."); see also MacLeod v. United States, 229 U.S. 416, 434, 48 Ct.Cl. 512, 33 S.Ct. 955, 57 L.Ed. 1260 (1913) ("The statute should be construed in the light of the purpose of the government to act within the limitation of the principles of international law, . . . and it should not be assumed that Congress proposed to violate the obligations of this country to other nations. . . ."); Ware v. Hylton, 3 U.S. (3 Dall.) 199, 260-61, 1 L.Ed. 568 (1796) (Iredell, J.) (stating the principle that statutes should not be interpreted to violate international legal obligations); Restatement (Third) of the Foreign Relations Law of the United States [hereinafter "Restatement"] § 114.
Id. at 196-97 (emphasis added). The ICCPR was ratified subject to a declaration of non-execution. See 138 Cong. Rec. S4781-01. As such, appellant has no judicially enforceable right directly arising out of a challenge to the ICCPR as it would be interpreted by its signatory nations; his argument can attack only the breadth of United States law implementing the treaty. Pierre v. Gonzales, 502 F.3d 109 (2d Cir.2007). This case does not involve such an attack. Until the treaty is implemented though congressional action, it cannot act as a limitation on the power of the Florida Legislature to determine the appropriate penalties for violations of the law. Medellin v. Texas, ___ U.S. ___, 128 S.Ct. 1346, 1354-57, 170 L.Ed.2d 190 (2008) (reaffirming that non-self-executing ratifications of international treaties cannot act as a limit on state power unless legislation exists implementing the treaty).
For the foregoing reasons, this court declines to implement a per se ban on the sentencing of juveniles to life imprisonment. Additionally, based on the underlying facts of this case, this court does not find appellant's sentence was grossly disproportionate to his crime. Accordingly, we affirm appellant's sentences.
THOMAS, J., and PLEUS, JR., ROBERT J., Associate Judge, concur.