884 So.2d 359 (2004)
Lynn R. FASSY, M.D., and Pain Medicine Associates, P.A., Petitioners,
v.
Julia P. CROWLEY, as Personal Representative of the Estate of Julia Lea Morgan, deceased, Respondent.
No. 2D04-1.
District Court of Appeal of Florida, Second District.
September 10, 2004.
*362 Ross L. Fogleman, III, and Claudia Rosenkoetter of Fogleman & Rosenkoetter, P.A., Sarasota, for Petitioners.
Ronald S. Gilbert of Morgan, Colling & Gilbert, P.A., Orlando, for Respondent.
WALLACE, Judge.
Lynn R. Fassy, M.D. (Dr. Fassy), and Pain Medicine Associates, P.A. (PMA), petition for a writ of certiorari seeking review of a nonfinal order that denied their motion to dismiss a complaint filed against them by Julia Crowley, as personal representative of the estate of Julia Lea Morgan, deceased (the Personal Representative). The complaint alleged that Dr. Fassy and PMA breached their statutory duty to Julia Morgan (the Decedent), a developmentally disabled person, under the Bill of Rights of Persons Who Are Developmentally Disabled, section 393.13, Florida Statutes (2002) (the Bill of Rights). Specifically, the complaint alleged that Dr. Fassy and PMA breached their duty under the Bill of Rights to keep the Decedent free from harm when she was excessively medicated through an implanted pain medication pump, causing her death. Section 393.13(3)(g) provides: "Persons who are developmentally disabled shall have a right to be free from harm, including unnecessary physical, chemical, or mechanical restraint, isolation, excessive medication, abuse, or neglect."
In the circuit court, Dr. Fassy and PMA argued that the Personal Representative's claim was essentially a medical malpractice action and that she had failed to follow the presuit notice and screening requirements of the Medical Malpractice Act, section 766.106, Florida Statutes (2002), and Florida Rule of Civil Procedure 1.650, the Medical Malpractice Presuit Screening Rule. Citing Integrated Health Care Services, Inc. v. Lang-Redway, 840 So.2d 974 (Fla. 2002), the circuit court noted that the test for determining whether the presuit notice requirements of section 766.106 apply is whether the plaintiff must rely on the medical negligence standard of care as set forth in section 766.102(1). Following the analysis set forth in Integrated Health Care Services, the circuit court denied Dr. Fassy and PMA's motion to dismiss, ruling that "since section 393.13(4)(c) sets forth its own standard of care, the presuit requirements of chapter 766 do not apply."
The circuit court departed from the essential requirements of law when it ruled that section 393.13(4)(c) set forth a standard of care applicable to the lawsuit at issue. For the reasons set forth below, we grant the petition for a writ of certiorari.

The Limited Standard of Review on Certiorari
Certiorari generally does not lie to review the denial of a motion to dismiss. Martin-Johnson, Inc. v. Savage, 509 So.2d 1097, 1099 (Fla.1987). Nonfinal orders are generally reviewable only on plenary appeal of the final order disposing of the *363 case. Florida Rule of Appellate Procedure 9.130(a)(3) designates those few types of nonfinal orders deemed important enough for immediate review. Certiorari review of nonfinal orders under rule 9.030(b)(2)(A) is "an extraordinary remedy which should not be used to circumvent the interlocutory appeal rule which authorizes appeal from only a few types of nonfinal orders." State Farm. Mut. Auto. Ins. Co. v. Peters, 611 So.2d 597, 598 (Fla. 2d DCA 1993) (citing Martin-Johnson, Inc., 509 So.2d 1097). "[I]t is extremely rare that erroneous interlocutory rulings can be corrected by resort to common law certiorari. It is anticipated that since the most urgent interlocutory orders are appealable under this rule, there will be very few cases where common law certiorari will provide relief." State v. Pettis, 520 So.2d 250, 252 (Fla.1988) (quoting rule 9.130 committee note).
A certiorari petition must satisfy three requirements before a district court can grant relief from an erroneous interlocutory order. "A petitioner must establish (1) a departure from the essential requirements of the law, (2) resulting in material injury for the remainder of the trial (3) that cannot be corrected on post-judgment appeal." Parkway Bank v. Fort Myers Armature Works, Inc., 658 So.2d 646, 648 (Fla. 2d DCA 1995). As the Parkway Bank court explained, the final two prongs of the test are jurisdictional. The district court must conduct the jurisdictional analysis before it is empowered to determine whether to grant relief on the merits, i.e., whether the nonfinal order departs from the essential requirements of the law. Id. at 649.
Certiorari jurisdiction may lie when chapter 766 presuit requirements are at issue. Pearlstein v. Malunney, 500 So.2d 585 (Fla. 2d DCA 1986); St. Mary's Hosp. v. Bell, 785 So.2d 1261, 1262 (Fla. 4th DCA 2001); Okaloosa County v. Custer, 697 So.2d 1297, 1297 (Fla. 1st DCA 1997). The statutes requiring presuit notice and screening "cannot be meaningfully enforced postjudgment because the purpose of the presuit screening is to avoid the filing of the lawsuit in the first instance." Parkway Bank, 658 So.2d at 649. In addition, interlocutory review may be necessary to promote the Medical Malpractice Reform Act's purpose of encouraging settlement. Cent. Fla. Reg'l Hosp. v. Hill, 721 So.2d 404, 405 (Fla. 5th DCA 1998).
In this case, without this court's intervention by writ of certiorari, the Personal Representative conceivably could obtain a judgment against Dr. Fassy and PMA. If, on appeal, Dr. Fassy and PMA succeed in obtaining a reversal of the judgment because the Personal Representative failed to comply with chapter 766 presuit requirements, then the appellate remedy would be inadequate to correct the error of subjecting Dr. Fassy and PMA to the very trial that presuit procedures were intended to prevent. In that event, the purposes of these cost-saving presuit procedures would be thwarted, and the appellate remedy would serve "no useful purpose." See Pearlstein, 500 So.2d at 587. Therefore, the nonfinal order under review, if in error, would result in material injury to Dr. Fassy and PMA that cannot be corrected on postjudgment appeal.
Satisfied that the jurisdictional prongs of the certiorari standard have been met, we turn to the remaining prong of the certiorari standard: whether the error of which Dr. Fassy and PMA complain constitutes a departure from the essential requirements of the law.

The Essential Requirements of Law
A departure from the essential requirements of the law necessary for the *364 issuance of a writ of certiorari is something more than a simple legal error. There must be a violation of a clearly established principle of law resulting in a miscarriage of justice. Combs v. State, 436 So.2d 93, 95-96 (Fla.1983). The inquiry is not as concerned "with the mere existence of legal error as much as with the seriousness of the error." Id. A failure to observe the essential requirements of the law has been held synonymous with a failure to apply "the correct law." Haines City Cmty. Dev. v. Heggs, 658 So.2d 523, 530 (Fla.1995).
Allstate Insurance Co. v. Kaklamanos, 843 So.2d 885, 890 (Fla.2003), held that "`clearly established law' can derive from a variety of legal sources," and thus "in addition to case law dealing with the same issue of law, an interpretation or application of a statute, a procedural rule, or a constitutional provision may be the basis for granting certiorari review." In Kaklamanos, no appellate case controlled the issue, so our supreme court looked to the intent of the personal injury protection (PIP) statute and read various parts of the statute in pari materia to find "clearly established law" upon which certiorari review could be granted. Id. at 891-92. The order reviewed in Kaklamanos failed to apply the correct law as clearly established, and the error was sufficiently egregious or fundamental to warrant certiorari review. Id. at 890.
Ivey v. Allstate Insurance Co., 774 So.2d 679, 682-83 (Fla.2000), cautioned that a misapplication of the correct law or an erroneous interpretation of a law does not rise to the necessary level. A decision "made according to the form of the law and the rules prescribed for rendering it, although it may be erroneous in its conclusion as applied to the facts, is not an illegal or irregular act or proceeding remedial by certiorari." Id. at 682 (paraphrasing Heggs, 658 So.2d at 525).

Chapter 766 Presuit Requirements in General
Chapter 766 presuit screening is required only where the plaintiff must rely upon the medical negligence standard of care as set forth in section 766.102(1). Integrated Health Care Servs., 840 So.2d at 980; Tenet St. Mary's, Inc. v. Serratore, 869 So.2d 729, 731 n. 1 (Fla. 4th DCA 2004). "The key inquiry under the statute is whether the action `aris[es] out of any medical, dental, or surgical diagnosis, treatment, or care.' If there is doubt as to the applicability of such a statute, the question is generally resolved in favor of the claimant." J.B. v. Sacred Heart Hosp. of Pensacola, 635 So.2d 945, 947 (Fla.1994) (quoting Baskerville-Donovan Eng'rs, Inc. v. Pensacola Executive House Condo. Ass'n, 581 So.2d 1301, 1303 (Fla.1991)); see also Feifer v. Galen of Fla., Inc., 685 So.2d 882, 885 (Fla. 2d DCA 1996). "[W]hen possible the presuit notice and screening statute should be construed in a manner that favors access to courts." Integrated Health Care Servs., 840 So.2d at 980 (quoting Patry v. Capps, 633 So.2d 9, 13 (Fla.1994)).
There are generally two types of cases in which chapter 766 presuit requirements may not apply in a medical care setting. The first is where a plaintiff can successfully allege factual matters constituting ordinary negligence of a health care provider. See, e.g., Tenet St. Mary's, 869 So.2d 729 (holding no chapter 766 presuit requirements for suit alleging simple negligence in postdialysis injury to patient's foot by employee); Lake Shore Hosp., Inc. v. Clarke, 768 So.2d 1251, 1252 (Fla. 1st DCA 2000) (holding presuit requirements inapplicable in hospital slip-and-fall negligence *365 action where plaintiff did not seek to state medical negligence claim).
The second type of case in which a plaintiff need not comply with chapter 766 presuit requirements is one in which the statute under which suit is brought provides its own standard of care independent of chapter 766. An action under one statute that sets forth its own cause of action and standards is not subject to the requirements of a different statute. For example, in Integrated Health Care Services, 840 So.2d at 980, the Medical Malpractice Act presuit requirements were held to be inapplicable to an action alleging that a nursing home violated a resident's rights under chapter 400, the Nursing Home Act, causing his death. The plaintiff allegedly sustained pressure sores resulting in the amputation of his leg and toe, suffered from poor nutrition and infection, and ultimately died. Id. at 975. Our supreme court explained that the Nursing Home Act created a "right to receive adequate and appropriate health care," § 400.022(1)(l), Fla. Stat. (1997), and a private right of action for deprivation of a nursing home resident's statutory rights, § 400.023(1). More important, chapter 400 established a standard of care "consistent with ... established and recognized practice standards within the community, and with rules as adopted by the agency," § 400.022(1)(l), and it had its own separate presuit investigation requirements for cases governed by it, § 400.023(1). For these reasons, the presuit requirements of chapter 766 did not apply to a lawsuit seeking to enforce only those rights enumerated in section 400.022. Integrated Health Care Servs., 840 So.2d at 979-80.

The Standard of Care Under Section 393.13(4)(c)
The Personal Representative contends that Integrated Health Care Services is analogous to this case because the Bill of Rights created a statutory right, not mentioned in chapter 766, under section 393.13(3)(g) and a private cause of action with liability for violations under section 393.13(5). See Baumstein v. Sunrise Cmty., Inc., 738 So.2d 420, 421 (Fla. 3d DCA 1999). The Personal Representative persuaded the circuit court that a claim founded on section 393.13(3)(g) can be proved by showing a breach of a standard of care other than medical malpractice under section 766.102(1), namely, section 393.13(4)(c), which provides: "Each client shall receive prompt and appropriate medical treatment and care for physical and mental ailments and for the prevention of any illness or disability. Medical treatment shall be consistent with the accepted standards of medical practice in the community." However, by applying section 393.13(4)(c), the circuit court applied the wrong law to the lawsuit before it.
Written into the basic structure of the Bill of Rights is a distinction between all "persons who are developmentally disabled" and "clients." "Clients" are a sub-class of developmentally disabled persons whom the Department of Children and Family Services (the Department) has determined are eligible for developmental services, § 393.063(5), and whom the Bill of Rights contemplates are receiving services authorized by the Department. The complaint alleged that the Decedent was a "person with a developmental disability" as defined in section 393.063(14), but it did not allege that she was a "client," nor is there any suggestion in our limited record that she was a "client."
The Bill of Rights protects two distinct categories of rights. First, section 393.13(3) identifies the "RIGHTS OF ALL PERSONS WITH DEVELOPMENTAL DISABILITIES" regardless of whether *366 the persons are clients of the Department. The complaint alleged a violation of section 393.13(3)(g), which protects the right of "[p]ersons who are developmentally disabled" to be free from harm. Second, section 393.13(4) identifies "CLIENT RIGHTS." The circuit court cited the standard of care contained in section 393.13(4)(c), which guarantees the right of each "client" to receive appropriate medical care. Section 393.13(3) and (4) is fully set forth in the endnote.[1] *367 *368
*369 A plain reading of the Bill of Rights reveals that the provisions of section 393.13(3) and section 393.13(4) cannot logically be combined in a lawsuit seeking to enforce the rights of a developmentally disabled person who is not a client. For example, section 393.13(4)(c) lists eight sub-parts prescribing procedures for monitoring a client's drug regime and alternate methods for obtaining informed consent with specific reference to "each client in a residential facility." These sub-parts make sense only in the context of a client receiving services authorized by the Department in a residential facility or other restricted setting. In fact, none of the subsections of section 393.13(4) can be construed as generally applicable to nonclients of the Department. E.g., § 393.13(4)(a)(1) (providing that each client shall be allowed to send and receive sealed, unopened mail); § 393.13(4)(b) (providing that each client has the right to possess his or her own clothing and personal effects). Thus the specific protections of section 393.13(4) are reserved only to clients of the Department.
By contrast, section 393.13(3) is applicable to both clients and nonclients by its express terms. Its provisions protect generally applicable rights such as religious freedom, the right to refuse treatment, and the right to vote. § 393.13(3)(b), (h), (j).
The distinction between "clients" and "all persons with developmental disabilities" is crucial, and it is carried forward to the liability provision of section 393.13(5), which provides:
LIABILITY FOR VIOLATIONS. Any person who violates or abuses any rights or privileges of persons who are developmentally disabled provided by this act shall be liable for damages as determined by law. Any person who acts in good faith compliance with the provisions of this act shall be immune from civil or criminal liability for actions in connection with evaluation, admission, habilitative programming, education, treatment, or discharge of a client. However, this section shall not relieve any person from liability if such person is guilty of negligence, misfeasance, nonfeasance, or malfeasance.
(Emphasis added.) This section contains a general liability provision for violations of the rights of all developmentally disabled persons, but it provides a specific good faith immunity for certain services provided only to clients. In this case, for example, Dr. Fassy and PMA would not be able to assert good faith immunity as an affirmative defense to the Personal Representative's claim because the Decedent was not a "client," even though, in the circuit court's view, Dr. Fassy and PMA would be held to a standard of care applicable only to the "treatment" of a "client." Compare § 393.13(4)(c) with § 393.13(5) (each referring to the "treatment" of a "client"). Section 393.13(5) illuminates the importance of the statutory distinction between clients *370 and all persons with developmental disabilities.
This distinction, affording greater and more specific protections to clients, accords with the Bill of Rights' legislative intent, which was chiefly concerned with promoting the deinstitutionalization of the developmentally disabled and providing meaningful treatment and habilitation through community-based services. § 393.13(2). The circuit court ignored clear legislative intent expressed on the face of the statute by merging the provisions of subsections (3) and (4) of section 393.13, applying the standard of care specifically limited to clients to a right generally guaranteed to all developmentally disabled persons in a lawsuit that sought to enforce the rights of a nonclient. Under a plain reading of the statute, section 393.13(4)(c) did not set forth a standard of care applicable to the Personal Representative's claim against Dr. Fassy and PMA.
The circuit court's error rises to a departure from the essential requirement of law for two reasons. First, we did not resort to rules of statutory construction in order to determine the error; a plain reading of the statute sufficed. See Holly v. Auld, 450 So.2d 217, 219 (Fla.1984) (quoting A.R. Douglass, Inc. v. McRainey, 102 Fla. 1141, 137 So. 157, 159 (1931): "[W]hen the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning."); Pearlstein, 500 So.2d at 587. Thus we are not merely disagreeing with the circuit court's interpretation of an otherwise applicable provision. Section 393.13(4)(c) does not apply.
In Kaklamanos, our supreme court found clearly established law by looking to the legislative intent underlying the PIP statute and from reading various parts of the statute in pari materia. 843 So.2d at 891-92. Likewise, we find the inapplicability of section 393.13(4)(c) by looking to the Bill of Rights' plain language, structure, and legislative intent expressed therein. The absence of a reported appellate decision on this issue will not lead us to be "too narrow" in our determination of clearly established law. See Kaklamanos, 843 So.2d at 891.
Second, the circuit court's error was sufficiently egregious or fundamental. See id. at 890 (explaining that a determination of the egregious or fundamental nature of the error is an essential component of certiorari review). Determining egregious or fundamental error calls for an exercise of principled discretion based on "the gravity of the error and the adequacy of other relief." Heggs, 658 So.2d at 531 n. 14. In Pearlstein, we concluded that our legislature, by enacting presuit notice and screening in medical malpractice cases, expressed a sense of urgency such that early intervention by means of certiorari was appropriate to correct errors thwarting the presuit requirements. 500 So.2d at 588 (drawing an analogy to News-Press Publishing Co. v. Gadd, 388 So.2d 276 (Fla. 2d DCA 1980), in which the legislative policy favoring expedition of proceedings involving media access to public records warranted early intervention by means of certiorari). The gravity of the error was heightened by the likelihood that "numerous similar cases, involving identical legal issues, may also be pending or forthcoming." Id. at 587.
Medical malpractice claims remain among the most intensively litigated in trial practice and the subject of frequent attention by our legislature. The gravity and urgency of the error involving presuit requirements that we perceived in Pearlstein in 1986 certainly has not abated in *371 2004. As noted, any remedy Dr. Fassy and PMA may obtain upon postjudgment appeal would be wholly inadequate for the material harm they would suffer as a result of the circuit court's erroneous order. For these reasons, the circuit court's error was sufficiently egregious or fundamental to warrant our intervention by writ of certiorari.

Conclusion
We grant the petition for certiorari, finding that the circuit court departed from the essential requirements of law when it ruled that section 393.13(4)(c) set forth a standard of care applicable to a lawsuit seeking to enforce the rights of a nonclient under section 393.13(3)(g). Our limited standard of review precludes us from addressing other questions this original proceeding may raise, such as whether chapter 766 presuit requirements would apply to any cause of action arising under subsection (3) of section 393.13 or subsection (4), or both subsections and, if so, under what circumstances. The order denying Dr. Fassy and PMA's motion to dismiss is quashed, and the case is remanded in a posture as if no order had been entered. See Snyder v. Douglas, 647 So.2d 275, 279 (Fla. 2d DCA 1994).
Petition for writ of certiorari granted.
FULMER, J., concurs.
COVINGTON, J., dissents with opinion.
COVINGTON, Judge, Dissenting.
I respectfully dissent. While I agree with the majority that the trial court erred, I would deny the petition for writ of certiorari because the error does not depart from the essential requirements of law as required to grant a petition for writ of certiorari on a nonfinal order.
As the majority correctly notes, certiorari generally does not lie to review the denial of a motion to dismiss. Martin-Johnson, Inc. v. Savage, 509 So.2d 1097, 1099 (Fla.1987). Furthermore, "In order to be reviewable by petition for certiorari, a nonfinal order must depart from the essential requirements of law, and thus cause material injury to the petitioner throughout the remainder of the proceedings below, effectively leaving no adequate remedy on appeal." State Farm Mut. Auto. Ins. Co. v. Peters, 611 So.2d 597, 598 (Fla. 2d DCA 1993).
Departure from the essential requirements of the law necessary for the issuance of a writ of certiorari is something more than a simple legal error. Ivey v. Allstate Ins. Co., 774 So.2d 679, 682 (Fla. 2000). A court's misapplication of the correct law or "erroneous interpretation" of a law does not rise to the necessary level. Id. at 682, 684; see also Stilson v. Allstate Ins. Co., 692 So.2d 979, 982-83 (Fla. 2d DCA 1997). The court in Ivey stated: "[a] decision made according to the form of the law and the rules prescribed for rendering it, although it may be erroneous in its conclusion as applied to the facts, is not an illegal or irregular act or proceeding remedia[ble] by certiorari." 774 So.2d at 682 (quoting Haines City Cmty. Dev. v. Heggs, 658 So.2d 523, 525 (Fla.1995) (additional citations omitted)). That is the case here.
The trial court here made its decision "according to the form of the law and the rules prescribed for rendering it." See id. The court applied the test set forth in Integrated Health Care Services, Inc. v. Lang-Redway, 840 So.2d 974, 977 (Fla. 2002), to determine whether a defendant is entitled to section 766.106 presuit screening requirements.
Whether section 766.203 presuit requirements apply to a cause of action founded on another statutory right, such as section 393.13(3)(g) here, turns on whether the claim can be proved by showing a breach *372 of some standard of care other than the medical malpractice standard. The answer in this case is not clearly established. Dr. Fassy and PMA argue that the trial court departed from the essential requirements of law by misinterpreting the significance of section 393.13(4)(c) to establish a standard of care outside section 766.102, Florida Statutes (2002). Section 393.13(4)(c) states:
Each client shall receive prompt and appropriate medical treatment and care for physical and mental ailments and for the prevention of any illness or disability. Medical treatment shall be consistent with the accepted standards of medical practice in the community.
I recognize that this standard of care, which the trial court ruled obviated the chapter 766 presuit requirements, applies to those disabled persons whom the statute defines as "clients." Section 393.063(4) defines "client" as any person determined eligible by the department for developmental services. The complaint does not allege that Julia Morgan was a "client" as so defined.
The trial court thus applied the standard of care guaranteed to clients under section 393.13(4)(c) to a right generally guaranteed to all developmentally disabled persons under section 393.13(3)(g), and thereby based its ruling on a misapplication of subsection (4). Nevertheless, these misapplications or misinterpretations do not rise to the level of a departure from the essential requirements of law meriting a writ of certiorari.
In Allstate Insurance Co. v. Kaklamanos, 843 So.2d 885 (Fla.2003), relied on by the majority, no appellate case controlled the issue and so the supreme court looked to the intent of the personal injury protection statute as "clearly established law" upon which certiorari review could be granted. More significantly, Kaklamanos was a second-tier certiorari review of a circuit court appellate decision, for which there was no further plenary appeal. See Fla. R.App. P. 9.030(b)(2)(B). In contrast, petitioners here present a nonfinal order for review.
The majority rightly acknowledge that nonfinal orders are generally reviewable only on plenary appeal of the final order disposing of the case. The supreme court has designated, in Florida Rule of Appellate Procedure 9.130(a)(3), those few types of nonfinal orders it deems important enough for immediate review. As noted by the majority, certiorari review of nonfinal orders under rule 9.030(b)(2)(A) is "an extraordinary remedy which should not be used to circumvent the interlocutory appeal rule which authorizes appeal from only a few types of nonfinal orders." State Farm Mut. Auto. Ins. Co. v. Peters, 611 So.2d 597, 598 (Fla. 2d DCA 1993) (citing Martin-Johnson, 509 So.2d 1097).
I certainly recognize the difficult position that Dr. Fassy and PMA face in that they may be subjected to "the very trial that presuit procedures were intended to prevent." Nevertheless, it is a stretch to say that relief upon postjudgment appeal would be wholly inadequate. Whatever material injury these defendants are to be dealt by virtue of the trial court's erroneous decision can be corrected on postjudgment appeal.
Lawsuits can be litigated in a piecemeal fashion, but doing so is not efficient. Premature reviews compel the appellate court to rule on issues before they have been fleshed out at the trial court level. The supreme court certainly has it within its rule-making authority to "establish a right of nonfinal appeal if it determines that such a pretrial appeal would be appropriate and cost-effective." Parkway Bank, *373 658 So.2d 646, 650 (Fla.2d DCA 1995). It has not done so, and neither should we.
NOTES
[1] Endnote:

393.13 Personal treatment of persons who are developmentally disabled.
(1) SHORT TITLE.This act shall be known as "The Bill of Rights of Persons Who are Developmentally Disabled."
....
(3) RIGHTS OF ALL PERSONS WITH DEVELOPMENTAL DISABILITIES.The rights described in this subsection shall apply to all persons with developmental disabilities, whether or not such persons are clients of the department.
(a) Persons with developmental disabilities shall have a right to dignity, privacy, and humane care, including the right to be free from sexual abuse in residential facilities.
(b) Persons with developmental disabilities shall have the right to religious freedom and practice. Nothing shall restrict or infringe on a person's right to religious preference and practice.
(c) Persons with developmental disabilities shall receive services, within available sources, which protect the personal liberty of the individual and which are provided in the least restrictive conditions necessary to achieve the purpose of treatment.
(d) Persons who are developmentally disabled shall have a right to participate in an appropriate program of quality education and training services, within available resources, regardless of chronological age or degree of disability. Such persons may be provided with instruction in sex education, marriage, and family planning.
(e) Persons who are developmentally disabled shall have a right to social interaction and to participate in community activities.
(f) Persons who are developmentally disabled shall have a right to physical exercise and recreational opportunities.
(g) Persons who are developmentally disabled shall have a right to be free from harm, including unnecessary physical, chemical, or mechanical restraint, isolation, excessive medication, abuse, or neglect.
(h) Persons who are developmentally disabled shall have a right to consent to or refuse treatment, subject to the provisions of s. 393.12(2)(a) or chapter 744.
(i) No otherwise qualified person shall, by reason of having a developmental disability, be excluded from participation in, or be denied the benefits of, or be subject to discrimination under, any program or activity which receives public funds, and all prohibitions set forth under any other statute shall be actionable under this statute.
(j) No otherwise qualified person shall, by reason of having a developmental disability, be denied the right to vote in public elections.
(4) CLIENT RIGHTS.For purposes of this subsection, the term "client," as defined in s. 393.063, shall also include any person served in a facility licensed pursuant to s. 393.067.
(a) Clients shall have an unrestricted right to communication:
1. Each client shall be allowed to receive, send, and mail sealed, unopened correspondence. No client's incoming or outgoing correspondence shall be opened, delayed, held, or censored by the facility unless there is reason to believe that it contains items or substances which may be harmful to the client or others, in which case the chief administrator of the facility may direct reasonable examination of such mail and regulate the disposition of such items or substances.
2. Clients in residential facilities shall be afforded reasonable opportunities for telephone communication, to make and receive confidential calls, unless there is reason to believe that the content of the telephone communication may be harmful to the client or others, in which case the chief administrator of the facility may direct reasonable observation and monitoring to the telephone communication.
3. Clients shall have an unrestricted right to visitation subject to reasonable rules of the facility. However, nothing in this provision shall be construed to permit infringement upon other clients' rights to privacy.
(b) Each client has the right to the possession and use of his or her own clothing and personal effects, except in those specific instances where the use of some of these items as reinforcers is essential for training the client as part of an appropriately approved behavioral program. The chief administrator of the facility may take temporary custody of such effects when it is essential to do so for medical or safety reasons. Custody of such personal effects shall be promptly recorded in the client's record, and a receipt for such effects shall be immediately given to the client, if competent, or the client's parent or legal guardian.
1. All money belonging to a client held by the department shall be held in compliance with s. 402.17(2).
2. All interest on money received and held for the personal use and benefit of a client shall be the property of that client and shall not accrue to the general welfare of all clients or be used to defray the cost of residential care. Interest so accrued shall be used or conserved for the personal use or benefit of the individual client as provided in s. 402.17(2).
3. Upon the discharge or death of a client, a final accounting shall be made of all personal effects and money belonging to the client held by the department. All such personal effects and money, including interest, shall be promptly turned over to the client or his or her heirs.
(c) Each client shall receive prompt and appropriate medical treatment and care for physical and mental ailments and for the prevention of any illness or disability. Medical treatment shall be consistent with the accepted standards of medical practice in the community.
1. Medication shall be administered only at the written order of a physician. Medication shall not be used as punishment, for the convenience of staff, as a substitute for implementation of an individual or family support plan or behavior modification programming, or in unnecessary or excessive quantities.
2. Daily notation of medication received by each client in a residential facility shall be kept in the client's record.
3. Periodically, but no less frequently than every 6 months, the drug regimen of each client in a residential facility shall be reviewed by the attending physician or other appropriate monitoring body, consistent with appropriate standards of medical practice. All prescriptions shall have a termination date.
4. When pharmacy services are provided at any residential facility, such services shall be directed or supervised by a professionally competent pharmacist licensed according to the provisions of chapter 465.
5. Pharmacy services shall be delivered in accordance with the provisions of chapter 465.
6. Prior to instituting a plan of experimental medical treatment or carrying out any necessary surgical procedure, express and informed consent shall be obtained from the client, if competent, or the client's parent or legal guardian. Information upon which the client shall make necessary treatment and surgery decisions shall include, but not be limited to:
a. The nature and consequences of such procedures.
b. The risks, benefits, and purposes of such procedures.
c. Alternate procedures available.
7. When the parent or legal guardian of the client is unknown or unlocatable and the physician is unwilling to perform surgery based solely on the client's consent, a court of competent jurisdiction shall hold a hearing to determine the appropriateness of the surgical procedure. The client shall be physically present, unless the client's medical condition precludes such presence, represented by counsel, and provided the right and opportunity to be confronted with, and to cross-examine, all witnesses alleging the appropriateness of such procedure. In such proceedings, the burden of proof by clear and convincing evidence shall be on the party alleging the appropriateness of such procedures. The express and informed consent of a person described in subparagraph 6. may be withdrawn at any time, with or without cause, prior to treatment or surgery.
8. The absence of express and informed consent notwithstanding, a licensed and qualified physician may render emergency medical care or treatment to any client who has been injured or who is suffering from an acute illness, disease, or condition if, within a reasonable degree of medical certainty, delay in initiation of emergency medical care or treatment would endanger the health of the client.
(d) Each client shall have access to individual storage space for his or her private use.
(e) Each client shall be provided with appropriate physical exercise as prescribed in the client's individual or family support plan. Indoor and outdoor facilities and equipment for such physical exercise shall be provided.
(f) Each client shall receive humane discipline.
(g) No client shall be subjected to a treatment program to eliminate bizarre or unusual behaviors without first being examined by a physician who in his or her best judgment determines that such behaviors are not organically caused.
1. Treatment programs involving the use of noxious or painful stimuli shall be prohibited.
2. All alleged violations of this paragraph shall be reported immediately to the chief administrative officer of the facility or the district administrator, the department head, and the Florida local advocacy council. A thorough investigation of each incident shall be conducted and a written report of the finding and results of such investigation shall be submitted to the chief administrative officer of the facility or the district administrator and to the department head within 24 hours of the occurrence or discovery of the incident.
3. The department shall promulgate by rule a system for the oversight of behavioral programs. Such system shall establish guidelines and procedures governing the design, approval, implementation, and monitoring of all behavioral programs involving clients. The system shall ensure statewide and local review by committees of professionals certified as behavior analysts pursuant to s. 393.17. No behavioral program shall be implemented unless reviewed according to the rules established by the department under this section. Nothing stated in this section shall prohibit the review of programs by the Florida statewide or local advocacy councils.
(h) Each client engaged in work programs which require compliance with federal wage and hour laws shall be provided with minimum wage protection and fair compensation for labor in accordance with the federal wage-per-hour regulations.
(i) Clients shall have the right to be free from unnecessary physical, chemical, or mechanical restraint. Restraints shall be employed only in emergencies or to protect the client from imminent injury to himself or herself or others. Restraints shall not be employed as punishment, for the convenience of staff, or as a substitute for a habilitative plan. Restraints shall impose the least possible restrictions consistent with their purpose and shall be removed when the emergency ends. Restraints shall not cause physical injury to the client and shall be designed to allow the greatest possible comfort.
1. Mechanical supports used in normative situations to achieve proper body position and balance shall not be considered restraints, but shall be prescriptively designed and applied under the supervision of a qualified professional with concern for principles of good body alignment, circulation, and allowance for change of position.
2. Totally enclosed cribs and barred enclosures shall be considered restraints.
3. Daily reports on the employment of physical, chemical, or mechanical restraints by those specialists authorized in the use of such restraints shall be made to the appropriate chief administrator of the facility, and a monthly summary of such reports shall be relayed to the district administrator and the Florida local advocacy council. The reports shall summarize all such cases of restraints, the type used, the duration of usage, and the reasons therefor. Districts shall submit districtwide quarterly reports of these summaries to the state Developmental Disabilities Program Office.
4. The department shall post a copy of the rules promulgated under this section in each living unit of residential facilities. A copy of the rules promulgated under this section shall be given to all staff members of licensed facilities and made a part of all preservice and inservice training programs.
(j)1. Each client shall have a central record. The record shall include data pertaining to admission and such other information as may be required under rules of the department.
2. Unless waived by the client, if competent, or the client's parent or legal guardian if the client is incompetent, the client's central record shall be confidential and exempt from the provisions of s. 119.07(1), and no part of it shall be released except:
a. The record may be released to physicians, attorneys, and government agencies having need of the record to aid the client, as designated by the client, if competent, or the client's parent or legal guardian, if the client is incompetent.
b. The record shall be produced in response to a subpoena or released to persons authorized by order of court, excluding matters privileged by other provisions of law.
c. The record or any part thereof may be disclosed to a qualified researcher, a staff member of the facility, or an employee of the department when the administrator of the facility or the secretary of the department deems it necessary for the treatment of the client, maintenance of adequate records, compilation of treatment data, or evaluation of programs.
d. Information from the records may be used for statistical and research purposes if the information is abstracted in such a way to protect the identity of individuals.
3. All central records for each client in residential facilities shall be kept on uniform forms distributed by the department. The central record shall accurately summarize each client's history and present condition.
4. The client, if competent, or the client's parent or legal guardian if the client is incompetent, shall be supplied with a copy of the client's central record upon request.
(k) Each client residing in a residential facility who is eligible to vote in public elections according to the laws of the state shall have the right to vote. Facilities operators shall arrange the means to exercise the client's right to vote.