WOLF, J.
We review a Petition for Writ of Certio-rari claiming error in the trial court’s Order Denying Motion of Defendants to Dismiss Pursuant to Section 766.206, Fla. Stat. The issue is whether the trial court departed from the essential requirements of law in denying petitioners’ (defendants, Keith Robert Oken, M.D., and Mayo Clinic of Florida) motion to dismiss respondent’s (plaintiff, Ted Williams) malpractice action for failing to timely comply with the statutory presuit requirements by failing to attach a corroborating affidavit of a “medical expert” as defined by section 766.202(6), Florida Statutes. We find merit in petitioners’ claim in that the affidavit, on its face, fails to comply with the statute. We, therefore, grant the petition.
Respondent sent a notice of his intent to initiate litigation to Dr. Oken and the Mayo Clinic of Florida. The notice alleged that on February 4, 2005, respondent went to the emergency room at St. Luke’s Hospital complaining of chest pain. The notice further alleged that while at the hospital, respondent was assessed by Catherine Northrop, M.D., who ordered, among other things, a consultation with Dr. Oken, a board certified cardiologist. In addition, *142 the notice alleged that Dr. Oken was negligent in “misrepresenting the EKG’s, failing to admit respondent to conduct a full cardiac work-up, and later recommending that respondent take Maalox when respondent called in with worsening cardiac symptoms.” The notice asserted that respondent suffered a compensable injury as a result of Dr. Oken’s negligence: an acute myocardial infarction.
Attached to the notice was what purported to be a statutorily required corroborating affidavit from medical expert, John D. Foster, M.D. According to the affidavit and his curriculum vitae (CV), Dr. Foster is a family physician who is board certified as both a family and emergency physician and who has:
become familiar with the appropriate work up and treatment of suspected cardiac patients in the emergency room, and the consequences of failure to timely provide appropriate work up and treatment under such circumstances.
Dr. Foster’s CV shows that he was previously employed at several hospitals as an emergency room physician. Upon receipt of the notice, petitioners state they sent respondent a letter requesting respondent provide any other corroboration of the claim.
Respondent filed a formal complaint basically alleging the same facts contained in the notice. Petitioners filed a Motion of the Defendants to Dismiss Pursuant to Section 766.206, Fla. Stat., alleging that Dr. Foster’s corroborating affidavit was legally insufficient to satisfy the presuit requirement outlined in section 766.102, Florida Statutes (2007). Specifically, petitioners alleged Dr. Foster was not a medical expert in the field of cardiology and, thus, was not a qualified “medical expert.”
Respondent filed a supplemental affidavit by Dr. Foster indicating that he is certified by the appropriate American boards in both Family Medicine and Emergency Medicine. In his supplemental affidavit, Dr. Foster stated he had experience in two medical specialties similar to that specialty practiced by Dr. Oken, to the extent that those are specialties that include the evaluation, diagnosis, or treatment of acute chest pain and impending myocardial infarction. Pursuant to this information, the trial judge found Dr. Foster to be a qualified medical expert within the meaning of section 766.202, Florida Statutes (2007). Outside of a conclusory statement in the affidavit, there are no facts set out demonstrating how the general practice areas of family and emergency medicine are or could be a specialty similar to cardiology.
Prior to instituting a claim based on medical negligence, a claimant must comply with the presuit requirements outlined in section 766.203(2), Florida Statutes. One of these requirements is the filing of a corroborating affidavit of reasonable grounds to initiate medical negligence from a medical expert as defined in section 766.202(6), Florida Statutes.
Section 766.202(6) defines a medical expert as:
[A] person duly and regularly engaged in the practice of his or her profession who holds a health care professional degree from a university or college and who meets the requirements of an expert witness as set forth in s. 766.102.
The question before this court is whether Dr. Foster meets the qualifications as an expert witness pursuant to section 766.102. Specifically, petitioners assert that the trial court erred when it denied their motion to dismiss and concluded that respondent’s expert was qualified as a medical expert under section 766.102(5), Florida Statutes, to corroborate respondent’s claim.
*143 We must first determine whether this case is one that is appropriate for certiorari review.
A non-final order for which no appeal is provided by Rule 9.130 is reviewable by petition for certiorari only in limited circumstances. The order must depart from the essential requirements of law and thus cause material injury to the petitioner throughout the remainder of the proceedings below, effectively leaving no adequate remedy on appeal. Brooks v. Owens, 97 So.2d 693 (Fla.1957); Kilgore v. Bird, 149 Fla. 570, 6 So.2d 541 (1942).
Martin-Johnson, Inc. v. Savage, 509 So.2d 1097, 1098-99 (Fla.1987) (footnotes omitted) (emphasis added). However, where a party can show the denial of an interlocutory order effectively leaves no adequate remedy on appeal, the supreme court has approved the grant of certiorari relief. See Pro-Art Dental Lab, Inc. v. V-Strategic Group, LLC, 986 So.2d 1244 (Fla.2008) (reviewing and reversing a lower court’s denial of a petition for writ of certiorari which held the circuit court retained subject matter jurisdiction over a tenant landlord dispute even where the dispute was properly raised before a county court); Belair v. Drew, 770 So.2d 1164 (Fla.2000) (allowing certiorari review of a trial courts denial of a motion to dismiss alleging the grandparent visitation statute unconstitutionally infringed on parents right to privacy, finding the harm sought to be prevented could not be remedied after visitation was granted, even if temporarily); Amente v. Newman, 653 So.2d 1030 (Fla.1995) (reviewing and reversing the Fifth Districts quashing of a discovery order raised on a petition for writ of certiorari); Tucker v. Resha, 648 So.2d 1187 (Fla.1994) (holding certiorari is appropriate for interlocutory review of an order denying qualified immunity protections where harm sought to be prevented cannot be undone following appeal).
Furthermore, the supreme court has recognized the granting of certiorari relief is appropriate to implement legislatively adopted policy concerning prerequisites which must be followed prior to proceeding with certain claims.[1] See, e.g., Globe Newspaper Co. v. King, 658 So.2d 518 (Fla.1995). Specifically, the supreme court approved of the grant of certiorari relief to review an order denying a petitioners request to add punitive damages pursuant to section 768.72 in some instances, stating:
In Kraft General Foods, Inc. v. Rosenblum, 635 So.2d 106 (Fla. 4th DCA), review denied, 642 So.2d 1363 (Fla.1994) (punitive damages claim), Henn v. Sandler, 589 So.2d 1334 (Fla. 4th DCA 1991) (financial worth discovery), and Sports Products, Inc. v. Estate of Inalien, 658 So.2d 1010 (Fla. 4th DCA 1994), review dismissed, 659 So.2d 1088 (Fla.1995), the district court ruled that the procedure mandated by section 768.72 must be followed, and failure to adhere to that procedure departs from the essential requirements of the law. The plain meaning of section 768.72 now requires a plaintiff to provide the court with a reasonable evidentiary basis for punitive damages before the court may allow a claim for punitive damages to be included in a plaintiffs complaint. To allow punitive damages claims to proceed as before would render section 768.72 meaningless. Furthermore, a plenary appeal cannot restore a defendant’s statutory right under section 768.72 to be free of punitive damages allegations in a *144 complaint until there is a reasonable showing by evidence in the record or proffered by the claimant. We therefore agree with the district court in Henn and Kraft and hold that appellate courts should grant certiorari in instances in which there is a demonstration by a petitioner that the procedures of section 768.72 have not been followed. We do not believe that this holding is in conflict with our decision in the Martin-Johnson case but rather is a recognition of the express requirements mandated by the statute.
Globe Newspaper Co., 658 So.2d at 519-520.
Likewise, the courts of this state have uniformly recognized the availability of certiorari review in cases where the presuit notice requirements of chapter 766 have not been met.
Certiorari jurisdiction may lie when chapter 766 presuit requirements are at issue. Pearlstein v. Malunney, 500 So.2d 585 (Fla. 2d DCA 1986); St. Mary’s Hosp. v. Bell, 785 So.2d 1261, 1262 (Fla. 4th DCA 2001); Okaloosa County v. Custer, 697 So.2d 1297, 1297 (Fla. 1st DCA 1997). The statutes requiring presuit notice and screening “cannot be meaningfully enforced post-judgment because the purpose of the presuit screening is to avoid the filing of the lawsuit in the first instance.” Parkway Bank, 658 So.2d at 649. In addition, interlocutory review may be necessary to promote the Medical Malpractice Reform Act’s purpose of encouraging settlement. Cent. Fla. Reg’l Hosp. v. Hill, 721 So.2d 404, 405 (Fla. 5th DCA 1998).
In this case, without this court’s intervention by writ of certiorari, the Personal Representative conceivably could obtain a judgment against Dr. Fassy and PMA. If, on appeal, Dr. Fassy and PMA succeed in obtaining a reversal of the judgment because the Personal Representative failed to comply with chapter 766 presuit requirements, then the appellate remedy would be inadequate to correct the error of subjecting Dr. Fas-sy and PMA to the very trial that pre-suit procedures were intended to prevent. In that event, the purposes of these cost-saving presuit procedures would be thwarted, and the appellate remedy would serve “no useful purpose.” See Pearlstein, 500 So.2d at 587.
Fassy v. Crowley, 884 So.2d 359, 363 (Fla. 2d DCA 2004).
Review of interlocutory orders concerning failure to comply with the present pre-suit notice requirements of chapter 766 has only been denied in two circumstances. One is where the issue is actually one of general applicability, such as statute of limitations, rather than an issue specifically peculiar to medical malpractice actions. For example, in Stemerman, Lazarus, Simovitch, Billings, Finer & Ginsburg, M.D.’s P.A. v. Fuerst, 4 So.3d 55, 57 (Fla. 3d DCA 2009), the court noted:
The petitioners, however, argue that certiorari review lies here on the basis that the expiration of the statute of limitations period also constitutes a failure to comply with the pre-suit notice requirements of chapter 766, Florida Statutes. Chapter 766 requires plaintiffs in medical malpractice suits to give notice to all prospective defendants of the intent to pursue litigation. See § 766.106(2), Fla. Stat. (2008). Certiorari review is indeed appropriate when chapter 766 pre-suit requirements are at issue. See Okaloosa County v. Custer, 697 So.2d 1297 (Fla. 1st DCA 1997).
We conclude that the issue before this Court is whether the statute of limitations barred the respondents’ cause of *145 action, not the failure to comply with the pre-suite notice requirements.
The other circumstance is where certio-rari review is sought to review sufficiency of the evidence presented at an evidentiary hearing to determine the reasonableness of counsel’s presuit investigation. St. Mary’s Hosp. v. Bell, 785 So.2d 1261 (Fla. 4th DCA 2001). Our case, however, fits into neither situation. We are asked to review the trial court’s legal determination concerning the sufficiency of the corroborating affidavit, which goes to the very core of the presuit notice requirement in medical malpractice actions — that there has been a review and a determination by a physician in the same or similar specialty of the malpractice claim (more thoroughly discussed herein). Allowing a corroborating affidavit to be filed by a physician who is only a generalist rather than one in the same or similar specialty to the defendant effectively deprives a malpractice defendant of the statutorily mandated process. Filing an affidavit that is facially at odds with the statutory policy is tantamount to the filing of no affidavit. Failure to review such an affidavit would be an abrogation of our duties to enforce the statutory policy. Similar to the punitive damage presuit requirement considered in Globe Newspaper, “[s]uch [presuit] statutes cannot be meaningfully enforced postjudgment because the purpose of the presuit screening is to avoid the filing of the lawsuit in the first instance.” Parkway Bank v. Fort Myers Armature Works, Inc., 658 So.2d 646, 649 (Fla. 2d DCA 1995).
In 2008, the Florida Legislature amended section 766.102 with respect to the requirements that must be possessed by an expert witness in a medical malpractice case. Ch. 2003-416, § 48, at 4086, Laws of Fla. Prior to the 2003 amendment, section 766.102(2)(b) and (c) stated in pertinent part:
(b) If the health care provider whose negligence is claimed to have created the cause of action is certified by the appropriate American board as a specialist, is trained and experienced in a medical specialty, or holds himself or herself out as a specialist, a “similar health care provider” is one who:
1. Is trained and experienced in the same specialty; and
2. Is certified by the appropriate American board in the same specialty.
[[Image here]]
(c) The purpose of this subsection is to establish a relative standard of care for various categories and classifications of health care providers. Any health care provider may testify as an expert in any action if he or she:
1. Is a similar health care provider pursuant to paragraph (a) or (b); or
2. Is not a similar health care provider pursuant to paragraph (a) or paragraph (b) but, to the satisfaction of the court, possesses sufficient training, experience, and knowledge as a result of practice or teaching in the specialty of the defendant or practice or teaching in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in a given field of medicine. Such training, experience or knowledge must be as a result of the active involvement in the practice or teaching of medicine within the 5-year period before the incident giving rise to the claim.
(Emphasis added).
After the 2003 amendment, section 766.102(5), Florida Statutes, now states in pertinent part:
A person may not give expert testimony concerning the prevailing professional standard of care unless that person is a *146 licensed health care provider and meets the following criteria:
(a) If the health care provider against whom or on whose behalf the testimony is offered is a specialist, the expert witness must:
1. Specialize in the same specialty as the health care provider against whom or on whose behalf the testimony is offered; or specialize in a similar specialty that includes the evaluation, diagnosis, or treatment of the medical condition that is the subject of the claim and have prior experience treating similar patients; and
2. Have devoted professional time during the 3 years immediately preceding the date of the occurrences that is the basis for the action to:
a. The active clinical practice of, or consulting with respect to, the same or similar specialty that includes the evaluation, diagnosis, or treatment of the medical condition that is the subject of the claim and have prior experience treating similar patients;
b. Instruction of students in an accredited health professional school or accredited residency or clinical research program in the same or similar specialty; or
c. A clinical research program that is affiliated with an accredited health professional school or accredited residency or clinical research program in the same or similar specialty.
(Emphasis added).
Prior to the 2003 amendment, any health care provider could testify as an expert and, thus, provide a presuit corroborating affidavit in any action if he or she was not a similar health care provider but, to the satisfaction of the court, possessed sufficient training, experience, and knowledge as a result of practice or teaching in the specialty of the defendant or practice or teaching in a related field of medicine. § 766.102(2)(c)(2), Fla. Stat. (2003). The effect of the 2003 amendment is that “training, experience and knowledge” in the defendant’s specialty no longer render any health care provider competent to testify as an expert or to give a presuit corroborating affidavit. Rather, the expert witness must specialize in the same specialty as the defendant or specialize in a similar specialty that includes the evaluation, diagnosis, or treatment of the medical condition at issue. § 766.102(5), Fla. Stat. (2007).
In this case, petitioner Oken, “the héalth care provider against whom ... the testimony is offered,” is a board certified cardiologist. There is no dispute that respondent’s expert does not specialize in cardiology. Thus, to corroborate respondent’s claim under section 766.102(5)(a)(l), Florida Statutes, respondent’s expert must specialize “in a similar specialty that includes the evaluation, diagnosis, or treatment of the medical condition that is the subject of the claim and have prior experience treating similar patients.”
Respondent’s expert indicated that he is board certified in both emergency and family medicine. Thus, the question is whether emergency or family medicine qualifies as a “similar specialty” to cardiology-
“Similar specialty” is not defined within the statutes. Case law also provides little useful guidance. What is clear from the statutory amendment, however, is that assertions regarding experience in a particular area, standing by themselves, are insufficient absent evidence of practice in a similar specialty. This interpretation of the statutory language is consistent with the intent of requiring a presuit affidavit and with the legislative history regarding the 2003 statutory amendment.
*147 Florida courts have consistently affirmed the importance of an appropriate verified medical expert opinion as a prerequisite to file suit for medical malpractice. This court has stated:
One clear purpose of requiring corroboration is to spare all parties (not to mention the judiciary) the time and expense of litigating spurious clams. The expert opinion requirement is designed “to prevent the filing of baseless litigation ... [and] to corroborate that the claim is legitimate.” Stebilla [v. Mussallem], 595 So.2d [136] at 139 [(Fla. 5th DCA 1992) ]. No party should be called on to defend at trial against allegations no competent witness can be found to support.
Archer v. Maddux, 645 So.2d 544, 546-47 (Fla. 1st DCA 1994) (emphasis added).
Consistent with this reasoning, it is the claimant’s burden to demonstrate by facts, rather than conclusions in the affidavit, that the person executing the affidavit meets the statutory requirement. The statutory requirement for medical experts who provide presuit affidavits in medical malpractice cases was part of the comprehensive medical liability reform package. These reforms were adopted in response to a perceived crisis in Florida healthcare involving reduced quality and availability of medical care due to skyrocketing costs of medical liability insurance. The Report of the Florida House Select Committee on Medical Liability Insurance discussed the changes to the statute defining “medical expert” and the presuit process. The House Select Committee noted:
The Governor’s Task Force recommended that the Legislature require experts reviewing pre-suit claims and defenses possess similar, or identical, credentials and expertise in the defendant’s specialty.
J. Dudley Goodlette, Chairman, Report of House Select Committee on Medical Liability Insurance at 58 (March 2003) (emphasis added).
The pre-2003 language of section 766.102 contained a “catch-all” provision that would allow a court to admit the testimony of an expert who:
Is not a similar health care provider ... but, to the satisfaction of the court, possesses sufficient training, experience, and knowledge as a result of practice or teaching in a related field of medicine, so as to be able to provide such expert testimony as to the prevailing professional standard of care in a given field of medicine.
§ 766.102(2)(c)2., Fla. Stat. (2002).
When the Legislature altered the language of section 766.102, it replaced the phrase “similar health care provider” with the phrase “same or similar specialty” and eliminated the former “catch-all” provision. It is no longer sufficient to be a “similar health care provider” or to have “sufficient training, experience and knowledge.” With the 2003 amendments, the “expert” must actively practice in the same or similar specialty.
Accordingly, the Legislature limited medical expert testimony so that only specialists would be permitted to testify against other specialists and only generalists would be able to testify against other generalists. To allow a family medicine physician, or an emergency medicine physician, to testify against a cardiologist simply because such physicians evaluate patients -with suspected cardiac problems would contradict the Legislature’s clear intent in revising section 766.102 and departs from the essential requirements of law.
Respondent claims that Dr. Foster is not a “generalist,” as described in the petition, but is instead “a physician whose *148 specialties have been certified by two American Boards ... whose expertise is often directed to the evaluation, diagnosis or treatment of acute chest pain caused by cardiac ischemia.” Dr. Foster is board certified in emergency medicine and family medicine — two “specialties” that require broad, general knowledge of numerous areas of medicine. The American Board of Emergency Medicine (ABEM) offers certification in emergency medicine and in five subspecialties, including Hospice and Palliative Medicine, Medical Toxicology, Pediatric Emergency Medicine, Sports Medicine, and Undersea and Hyberbaric Medicine. See http://www.abem.org (find subspecialty certification link).[2] Neither *149 the general certification nor any of these subspecialty certifications, however, require any specifically focused training in cardiology. Id.
The American Board of Family Medicine (ABFM) defines family medicine as follows:
Family medicine is the medical specialty which provides continuing, comprehensive health care for the individual and family. It is a specialty in breadth that integrates the biological, clinical and behavioral sciences. The scope of family medicine encompasses all ages, both sexes, each organ system and every disease entity.
https://www.theabfm.org/about/policies/ aspx (emphasis added). A family medicine physician is the classic example of a generalist.
Unlike Dr. Foster, who professes no special training in cardiology, Dr. Oken is Board Certified by the American Board of Internal Medicine (ABIM) and has additional training and certification in the specialty of cardiology. To become certified in the subspecialty of cardiovascular disease, the ABIM requires that applicants have been previously certified in internal medicine by the ABIM and: 1) complete the requisite graduate medical education fellowship training; 2) demonstrate clinical competence in the care of patients; 3) meet licensure and procedural requirements; and 4) pass the Certification Exam in Cardiovascular Disease. http://www. abim.org/certification/policies/imss/card/ aspx. Certification in this specialty requires a minimum of an additional 36 months of training, with a minimum of 24 months of clinical practice, and requires that the candidates gain experience with and competence in a number of specific cardiac procedures, including electrocardiography and echocardiography. Id. Thus, Dr. Oken has completed specialized training and demonstrated a higher level of competency required to receive specialty certification in cardiology.
Among many other things, Dr. Foster’s expertise as an emergency medicine physician involves and concerns the initial evaluation of patients with suspected cardiac symptoms. After the initial evaluation, an emergency medicine physician typically calls in a cardiologist with the special expertise necessary to conduct a more thorough investigation and to diagnose, treat, and manage the patient with the suspected cardiac problem. That is precisely what *150 occurred here. The alleged negligence in this case involves only the advice given after consultation by the expert who was called in to make such consultation.
A cardiologist like Dr. Oken becomes involved in an emergency room patient’s care because emergency medicine physicians, like Dr. Northrop and Dr. Foster, although possessing a broad spectrum of general knowledge, lack the specifically focused education, training, and experience to provide the specialized diagnosis and treatment needed by patients suffering from cardiac complaints. If the plaintiffs claims in the Notice had concerned allegations of an improper consultation or the failure to properly consult with a cardiologist, Dr. Foster’s affidavit would be relevant and appropriate. In the instant facts, it is neither.
Allowing an emergency medicine physician to comment on the specialized care provided by a cardiologist simply because an emergency medicine physician sees patients with cardiac problems in the emergency room would vitiate the public policy underlying the Legislature’s 2003 amendments to chapter 766. The effect of the trial court’s ruling is to elevate emergency medicine physicians (and other generalists) to the level of an expert not only in their own field of medicine but in every field and specialty. With its ruling, the trial court has altered Dr. Foster’s status as a “generalist” and made him a “specialist” in all areas of medicine he encounters in the emergency room. If emergency medicine physicians are allowed to testify to the standard of care for the specialized treatment of any type of complaint typically seen in the emergency room (e.g., headache, abdominal pain, shortness of breath), emergency medicine physicians will be qualified to testify as to virtually every specialty (e.g., neurology, gastroenterolo-gy, pulmonology). Family medicine and internal medicine physicians, likewise, would be qualified to comment on the standard of care of all specialists. This is neither what the law now permits nor what the Legislature intended.[3]
We grant the petition. The decision of the trial court denying the motion to dismiss is quashed.
BENTON, J., concurs; BROWNING, J., dissents with separate opinion.

. In a slightly different context, we recently approved of the use of another common law writ to enforce legislatively mandated pretrial procedures. See Hair v. State, 17 So.3d 804 (Fla. 1st DCA 2009).

. This footnote addresses the dissent's general attack on the use of internet citations and research. First, it should be noted that the result would not have been any different without the internet citations.
No one can argue that indiscriminate, independent internet research by a judge involving subjective facts, non-legal opinions and studies, or the use of unknown or unverified websites not presented by the parties would create significant concerns. The use of generally-known knowledge, however, which is capable of accurate and ready determination from sources whose accuracy cannot reasonably be questioned, does not present the same concerns. Elizabeth G. Thornburg, The Curious Appellate Judge: Ethical Limits on Independent Research, 28 Rev. Litig. 131 (Fall 2008). This is especially true when the source has been cited by one of the parties and there has been no objection or motion to strike by the opposing party.
In the instant case, petitioners, in their reply, presented the citations in question. The citations were from the official websites of the American Board of Emergency Medicine, the American Board of Family Medicine, and the American Board of Internal Medicine — sources whose accuracy cannot be reasonably questioned and the very sources that Dr. Foster claims he received his certification from. The contested research only involved generally the areas of practice included in a particular specialty. These are the types of facts that are (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. These qualifications are the standard for judicial notice both under section 201 of the Federal Rules of Evidence and section 90.202, Florida Statutes (2008); thus, the use of this type of factual internet research should not be the subject of controversy. See Thornburg, supra at 157-8. In addition, respondent neither moved to strike nor raised any objection to the use of the citations.
Many Florida appellate courts have taken judicial notice of internet materials that cannot be reasonably questioned to support their arguments and, thus, contrary to the dissent's assertions, this court’s reliance on the underlying materials does not violate binding precedent. Recently, on judge on the Fifth District used a medical website to look at the normal procedures in a particular case.
The fallacy of this argument becomes readily apparent when consideration is given to the fact that one of the first things an obstetrician does is to determine the delivery date in order to establish a care regimen and protocol for the patient and set future examination dates. See The Merck Manual of Diagnosis and Therapy 1744-59 (Robert Berkow, M.D., et al. eds., 15th ed. 1987); see also The Merck Manuals Online Medical Library § 22 (Robert S. Porter, M.D., et al. eds., 2003), available at http://www.merck. com/mmhey'sec22/ch257/ch257b.html.
Weeks v. Fla. Birth-Related Neurological, 977 So.2d 616, 630 (Fla. 5th DCA 2008) (Sawaya, J., concurring).
Similar factual determinations were made with references to internet sites in Perkovich v. Humphrey-Perkovich, 2 So.3d 348, 350 (Fla. 2d DCA 2008) (citing WebMD to define a benign essential tumor); Gonzalez v. Tracy, 994 So.2d 402 (Fla. 3d DCA 2008) (using an online medical encyclopedia in note 1 to define plantar fasciitis); see also Rogers v. State, 957 So.2d 538, 551 n. 15 (citing a United States Department of Justice website to establish that an investigative report describing poor laboratory conditions at the FBI crime lab was released in 1997); Ward v. State, 986 So.2d 479, 490 (Fla.2008) (Anstead, J., dissenting) (citing the Florida Senate website to establish legislative intent); Strand v. Escambia County, 992 So.2d 150, 160 (Fla.2008) (citing Florida Constitution Revision Commission's website to support assertion that no proposed revisions affected the application of *149 binding caselaw); Williams v. Davis, 974 So.2d 1052, 1064 n. 13 (Fla.2007) (Cantero, J., concurring) (citing a Leon County Public Works website to identify the importance of canopy roads in Florida): Green v. State, 998 So.2d 1149, 1150 n. 4 (Fla. 2d DCA 2008) (Altenbemd, X, concurring) (citing the Florida Department of Corrections website’s estimate of approximately $50 a day to house, feed, clothe, educate, and provide medical expenses to an inmate at a major prison); Hollowell v. Tamburro, 991 So.2d 1022, 1024 n. 1 (Fla. 4th DCA 2008) (citing news article explaining local attorney was arrested on charges of fraud to explain delay in parties’ actions).
To demonstrate how well accepted internet citation has become, numerous cases have utilized internet citation since the first of this year. The Florida Supreme Court utilized internet citations in at least five cases, including: In Re Certification of Need for Additional Judges, 3 So.3d 1177 (Fla.2009); E.A.R. v. State, 4 So.3d 614 (Fla.2009); Florida Board of Bar Examiners re Webster, 3 So.3d 1058 (Fla.2009). The Third District used them in at least two cases: Browning v. Angelfish Swim School, Inc., 1 So.3d 355 (Fla. 3d DCA 2009); Griem v. Becker, 4 So.3d 721 (Fla. 3d DCA 2009). The Fourth District used them in at least two cases: Bortell v. White Mountains Ins. Group, Ltd., 2 So.3d 1041 (Fla. 4th DCA 2009); Kitchens v. Kitchens, 4 So.3d 1 (Fla. 4th DCA 2009). Indeed, this court has utilized internet citations in two recent cases. See Peterson v. State, 983 So.2d 27, 29 (Fla. 1st DCA 2008); Graham v. State, 982 So.2d 43, 49 (Fla. 1st DCA 2008).

. While one may quarrel with the wisdom of the law, it is not the job of this court to explore the wisdom of this policy.